UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

JUAN SIGUI, et. al.                          :
                                             :
          v.                                 :          C.A. No. 14-442S
                                             :
M&M COMMUNICATIONS, INC.,                    :
et al.                                       :


## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge


Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B)) are

Defendant Cox Rhode Island Telecom, LLC and Coxcom, LLC's ("Cox") Motion to Dismiss

(Document No. 15); Defendant William Dowling's ("Dowling") Motion to Dismiss (Document No.

16); and Defendant M&M Communications, Inc. ("M&M") and William Dowling's Motion to

Dismiss (Document No. 17). Plaintiffs oppose all three Motions. (Document Nos. 20, 21 and 22).

A hearing was held on May 12, 2015. For the following reasons, I recommend that Defendants'

Motions be DENIED in part and GRANTED in part, as discussed below.

### FACTS

Plaintiffs' First Amended Complaint contains four counts. Count I alleges a violation of the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et. seq. Count II alleges a violation of the

Rhode Island Minimum Wage Act ("RIMWA"), R.I. Gen. Laws § 28-12-1, et. seq. Count III alleges

misclassification in violation of R.I. Gen. Laws § 28-14-19.1  Count IV alleges race discrimination

in violation of 42 U.S.C. § 1981.  The following facts are gleaned from Plaintiffs' First Amended

Complaint (Document No. 5) and, if well-pled, must be accepted by the Court as true in considering

Defendants' Motions to Dismiss. Plaintiffs, Juan Sigui, Jose Sigui, Jose Cipriano, Joseph Mendez,

Jose L. Santos, and Anthony R. Kern, bring this action against their former employer(s), M&M, Cox, and Dowling.

With respect to the claims brought under the FLSA, this action is brought pursuant to the opt-in collective action provisions of the FLSA, 29 U.S.C. § 216(b).  Id. at ¶ 2.[1]  Additionally, and in the alternative, with respect to the FLSA claims, Plaintiffs bring this action as a "multi party action." Id. at ¶ 3.  With respect to the RIMWA claims, Plaintiffs bring this action as a "multi party action." Id. at ¶ 4.  With respect to the claims under 42 U.S.C. § 1981, Plaintiffs Juan Sigui, Jose Sigui, Jose Cipriano, Joseph Mendez and Jose L. Santos bring this action as a "multi party action."  Id. at ¶ 5.

Plaintiffs bring this action on behalf of themselves and all other similarly situated current and former employees of Defendants, who were and/or are affected by the actions, pay schemes, policies and procedures of Defendants as described herein.  Id. at ¶ 20.  Plaintiffs also bring this action in their individual capacities, separate and apart from the collective action claims set forth herein.  Id. at ¶ 21.  With respect to the collective action claims under the FLSA, Plaintiffs seek relief on behalf of two classes.[2]  Id. at ¶ 22.

---

[1] Defendants have moved to dismiss the FLSA collective action portion of the Amended Complaint.  At this early stage, the Court is tasked with examining the "pleadings and any affidavits to determine, under a 'fairly lenient standard,' whether the putative class members 'were subject to a single decision, policy, or plan that violated the law.' Mejias v. Banco Popular de Puerto Rico, 86 F. Supp. 3d 84, 85-86 (D.P.R. 2015) (citation omitted).  The Mejias Court noted that this pre-discovery evaluation is "not particularly stringent," "fairly lenient," "flexible," and "not heavy." Id. (citation omitted).  Plaintiffs' detailed Amended Complaint meets this threshold, and I recommend that the Motion to Dismiss the collective action portions of the Amended Complaint be DENIED.

[2] The First FLSA collective action class is defined as follows: All individuals employed as Field Service Technicians (or other comparable positions) who were hired and paid by Defendants by and through Defendant M&M to perform installation, maintenance, and/or construction services on cable television, Internet, and/or telephone lines and/or equipment for customers of Defendants obtained by and through Defendant Cox and were subject to the following common practices or policies of the Defendants, at any time from three (3) years before the filing of this Complaint to the present: (a) Who were paid IRS Form 1099 compensation; and, (b) Were not paid wages for all hours worked; and/or, (c) Who worked more than forty hours; and, (d) Were not paid at least one and one-half times their regular rate of pay for all overtime hours worked.
    The Second FLSA collective action class is defined as follows: All individuals employed as Field Service Technicians (or other comparable positions) who were hired and paid by Defendants by and through Defendant M&M to perform installation, maintenance and/or construction services on cable television, Internet, and/or telephone lines

Plaintiffs are similarly situated with other Field Service Technicians or other similarly titled positions (collectively referred to as "Field Service Technicians") employed by Defendants in that they were all subject to the same payroll practices, policies and procedures of Defendants, performed similar work under similar working conditions, and were subject to the same unlawful practices alleged in this Complaint and sustained the same or similar damages as a result. Id. at ¶ 25. Each of the named Plaintiffs are members of both FLSA classes as each was employed by the Defendants for periods of time as a misclassified Independent Contractor and as an employee during the three (3) years before the filing of this Complaint to the present. Id. at ¶ 26.

Cox provides cable, telephone, and Internet communications services to residents and businesses in the State of Rhode Island and throughout parts of the United States. Id. at ¶ 30. Cox contracted with M&M to perform on-site installation, maintenance, and construction services on cable television, Internet, and telephone lines and equipment for customers in and around the State of Rhode Island. Id. at ¶ 31. All of M&M's business came from Cox during the relevant time period and was performed to a standard, on a schedule, and in a manner specified by Cox. Id. at ¶ 32. Indeed, in filings with the Rhode Island Secretary of State, M&M described "the character of business conducted" in the state as "cable TV installs contracted through Cox Cable." Id. at ¶ 33. Plaintiffs all worked for Defendants as Field Service Technicians. Id. at ¶ 34.

Plaintiffs' job duties as Field Service Technicians included performing on-site installation, maintenance, and/or construction work on cable television, Internet, and/or telephone lines and/or

---

and/or equipment for customers of Defendants obtained by and through Defendant Cox and were subject to the following common practices or policies of the Defendants, at any time from three years before the filing of this Complaint to the present: (a) Who were paid IRS Form W-2 wages; and, (b) Were not paid wages for all hours worked; and/or, (c) Who worked more than forty hours; and, (d) Were not paid at least one and one-half times their regular rate of pay for all overtime hours worked. (Document No. 5 at ¶ 24).

equipment for residential and business customers of Cox in and around the State of Rhode Island (hereinafter referred to as the "work"). Id. at ¶ 35. At all relevant times, Defendants employed individuals such as the Plaintiffs as Field Service Technicians to perform the work. Id. at ¶ 36. On information and belief, as a condition of employment, Plaintiffs were required to sign documents prepared by M&M that misrepresented the true relationship between them and Defendants as Independent Contractors when the relationship was legally that of employee and employer. Id. at ¶ 37. At the same time that Defendants sought to designate Plaintiffs as Independent Contractors, they treated them as employees and exercised nearly total control over the manner and means by which they performed their job duties, including what, where, how and when they performed their job duties and for whom. Id. at ¶ 38. Defendants' control over Plaintiffs included, but was not limited to the following: (1) supplying and mandating the type, style and color of uniform; (2) requiring that Defendants' business names – not the name of each Plaintiff – be prominently displayed on the uniform; (3) requiring that Defendants' business names be prominently displayed on the work van; (4) providing the supplies necessary to perform the work; (5) supplying equipment necessary to perform the work; (6) providing or arranging for the training necessary to perform the work; (7) providing the customers for whom to perform the work; (8) specifying the work to be performed; (9) mandating how the work is to be performed; (10) scheduling the time when the work is to be performed; (11) establishing the manner in which the work is to be performed; (12) assigning and controlling the amount and type of work performed; (13) receiving all customer complaints and feedback on the work performed; (14) inspecting the work performed; (15) establishing the amount and manner by which compensation to Plaintiffs is calculated and paid; (16) mandating attendance at weekly meetings; (17) mandating that Plaintiffs report to Defendants'

Warwick Facility Monday through Saturday at a designated time or some regular interval; and (18) mandating multi-week unpaid training periods at the start of employment.  Id. at ¶ 39.

Plaintiffs were not permitted to bid on, refuse or select the work assignments issued by Defendants – they had to accept the work assigned.  Id. at ¶ 40.  Notwithstanding the foregoing, for all or a portion of their employment during the relevant period, Defendants misclassified and paid Plaintiffs as independent contractors and annually issued them IRS Forms 1099 when they should have been paid wages as employees and annually issued IRS Forms W-2 in violation of, inter alia, R.I. Gen. Laws § 28-14-19.1.  Id. at ¶ 41.

Defendants maintained and enforced policies that required Plaintiffs to report to work in a designated uniform supplied by the Defendants.  Id. at ¶ 42.  Defendants maintained and enforced policies that typically required Plaintiffs to attend weekly meetings at the Warwick facility.  Id. at ¶ 43.  Defendants maintained and enforced policies that typically required Plaintiffs to report to work Monday through Saturday at or about 7:30 a.m.  Id. at ¶ 44.  Defendants maintained and enforced policies that required Plaintiffs to call the office prior to the start of the shift when they were unable to work.  Id. at ¶ 45.  Cox scheduled appointment times for the work to be performed and provided work orders to M&M, which would, in turn, assign the work to Plaintiffs.  Id. at ¶ 46.

At the beginning of each shift, Plaintiffs who were assigned work received documents from Defendants that identified (1) the customers they were required to service that day; (2) the work that Defendants required them to perform for each customer; and (3) the time of day that Defendants required them to provide the work to each customer.  Id. at ¶ 47.  After collecting all of the parts and supplies that were required to perform the assigned work, Plaintiffs traveled to the location of each

customer and completed the work that Defendants directed them to perform. Id. at ¶ 48. Plaintiffs were not allowed to contract with the customers of Cox to perform other services that were not previously purchased by the customers from Defendants, nor were customers able to contract with M&M directly. Rather, orders for work always passed through Cox. Id. at ¶ 49.

After completing the work assigned by Defendants, Plaintiffs were not paid by customers of Cox. Id. at ¶ 50. Plaintiffs did not determine how much to charge the customers for the work. Id. at ¶ 51. Rather, Defendants set the prices and performed the billing for the services provided by Plaintiffs to the customers of Cox. Id. at ¶ 52. Defendants fixed the compensation of Plaintiffs through an elaborate task based "point system" determined by Cox and designed to purportedly approximate the time needed to complete each enumerated task. Id. at ¶ 53. Nevertheless, Plaintiffs were often required to perform numerous other tasks for which they were not compensated. Id. at ¶ 54. After completing their work, Plaintiffs prepared documents identifying the work performed for the customers of Cox and submitted those documents to M&M. Id. at ¶ 55. M&M in turn paid Plaintiffs according to fixed rates for the assigned work they completed. Id. at ¶ 56. Plaintiffs did not negotiate their own rates and pay structure with Defendants nor did they submit a bid for performance of the work. Id. at ¶ 57. Rather, Plaintiffs were each paid fixed rates for the assigned work completed that Defendants unilaterally determined and fixed. Id. at ¶ 58.

The work performed by Plaintiffs was an integral part of Defendants' business. Id. at ¶ 59. Instead of  classifying and paying all Field Service Technicians as employees, Defendants improperly classified and paid Plaintiffs as Independent Contractors for all or a portion of their employment during the relevant period. Id. at ¶ 60. During the relevant period, Defendants treated Plaintiffs and certain Class Plaintiffs as Independent Contractors and then subsequently reclassified

them as employees and vice versa, without any corresponding change in their job duties, method of compensation, supervision or control over the work.  Id. at ¶ 61.

Cox exercised near total control and authority over the employment of Plaintiffs.  Id. at ¶ 62. M&M's exclusive source of business was performing work for Cox customers.  Id. at ¶ 63. Plaintiffs provided work exclusively for customers of Cox.  Id. at ¶ 64.  Accordingly, M&M, and by extension, Plaintiffs, were totally dependent upon Cox for their continued employment.  Id. at ¶ 65.  The work performed by Plaintiffs constituted a discrete line job that was an integral part of Cox's product and overall business objective.  Id. at ¶ 66. Cox devised and imposed a task-based "point system" of compensation by which the compensation Plaintiffs received for performing the work was fixed, giving Cox effective control over the compensation that Plaintiffs received.  Id. at ¶ 67.  In addition, Cox monitored how much time it took Plaintiffs to complete the work and would, from time to time, lower the point value assigned to various tasks and/or the amount paid per point. Id. at ¶ 68.  Indeed, on at least one occasion, a representative of Cox addressed a meeting with Plaintiffs at the Warwick facility and stated that the point values for certain tasks and/or the per-point value were being reduced because Plaintiffs were performing the work too quickly.  Id. at ¶ 69.

Cox required Plaintiffs to wear uniforms and apparel indicating that they were performing work for Cox.  Id. at ¶ 70.  Cox required Plaintiffs to display a sign on their vehicles indicating that they were performing work for Cox.  Id. at ¶ 71.  Cox required Plaintiffs to leave its printed materials such as "welcome kits" and/or other such business documentation and pamphlets for customers for whom they performed work.  Id. at ¶ 72.  Additionally, Plaintiffs used and/or installed Cox's equipment, including, but not limited to, cable boxes, wires and connectors.  Id. at ¶ 73.  For

instance, Plaintiffs established connectivity with cable, telephone, and internet communications lines and systems owned by Cox and they performed work on telephone lines under the auspices of the license held by Cox. Id. at ¶ 74. The work performed by Plaintiffs was done according to guidelines and specifications established by Cox. Id. at ¶ 75. Cox also closely monitored the performance of work by Plaintiffs. Id. at ¶ 76. For instance, Cox exercised its quality control authority by inspecting the work performed by Plaintiffs. Id. at ¶ 77. Additionally, upon information and belief, Cox contacted customers serviced by Plaintiffs to conduct customer satisfaction surveys. Id. at ¶ 78. If Cox concluded the work was not performed properly, Cox would "back charge" an amount fixed by it that was involuntarily deducted from paychecks of Plaintiffs. Id. at ¶ 79.

Plaintiffs regularly and consistently worked more than forty hours per week, but Defendants failed to pay them one and one-half times their regular rate of pay for the hours worked weekly in excess of forty. Id. at ¶ 80. Additionally, Plaintiffs were deprived of wages when Defendants refused to compensate them for all time worked, including but not limited to the failure to compensate for the following time: (1) reporting to the Warwick Facility when no work was assigned; (2) loading the work van at the start of the day, and unloading the work van at the end of the day; (3) attendance at mandatory company meetings; (4) traveling to customers' homes or places of business; (5) waiting for assignment of work or to perform said work for customers; (6) reporting to locations for work when the customers were not present and/or failed to show; (7) reporting to locations to advise customers that work could not be performed; (8) reporting to locations where they were unable to perform the work due to technological or other reasons; (9) performing additional, unscheduled, and unassigned tasks, including an on-site inspection of the customer's existing Defendant Cox services and repair of any deficiencies found; (10) returning to a location

to complete, revise, or repair work previously performed; and (11) participating in and performing work during a multi-week unpaid training period at the start of employment.  Id. at ¶ 81.

Plaintiffs were typically required to show up at the offices of M&M every morning, and, if they were not assigned work, they were sent home without compensation in violation of R.I. Gen. Laws § 28-12-3.2.  Id. at ¶ 82.  Plaintiffs were typically required to attend mandatory weekly meetings at the Warwick Facility without compensation.  Id. at ¶ 83.  Plaintiffs were required to report to the customers' job site and inspect the site, and, if there was assigned work which could not be completed for any reason, Plaintiffs were not compensated.  Id. at ¶ 84.

Additionally, Plaintiffs were frequently required to perform work at the customers' job site without compensation.  Id. at ¶ 85.  For instance, Plaintiffs would report to a customers' home to perform a discrete task and were forced to spend many uncompensated hours fixing other problems such as running new wiring and/or configuring the internet modem, the cable box, and/or the phone lines.  Id. at ¶ 86.  Defendants improperly charged and involuntarily deducted from Plaintiffs' paychecks the cost of specialized equipment and apparel necessary to perform the work, including magnetic signs for the work van, meters, hazard cones, ladders, crimpers, strippers, uniforms, and safety vests.  Id. at ¶ 87.  Defendants also improperly charged and involuntarily deducted from Plaintiffs' paychecks the cost of using a company van to perform the work.  Id. at ¶ 88.

Defendants would "back charge" Plaintiffs for various reasons, including performing purportedly deficient or incomplete work or failing to submit time sheets, by involuntarily and improperly deducting monetary penalties from Plaintiffs' paychecks, according to schedules unilaterally established by Defendants.  Id. at ¶ 89. Even though Defendants purported to pay Plaintiffs for work performed based on "points" allotted to each of the various tasks, Defendants

required Plaintiffs to submit weekly time sheets documenting time spent performing the work, and expressly instructed Plaintiffs not to record more than forty hours of time worked in any one workweek. Id. at ¶ 90.

Despite the fact that Plaintiffs were non-exempt employees, Defendants failed or refused to pay Plaintiffs' wages for all hours worked and/or for overtime pay and/or minimum shift pay in numerous workweeks as required by the FLSA and RIMWA. Id. at ¶ 92. Defendants are liable for the payment of wages or overtime wages for all hours Plaintiffs were "suffered or permitted to work" – regardless of whether the work was requested, authorized or needed, whenever Defendants knew or had constructive knowledge that the work was being performed. Id. at ¶ 93. Defendants knew or had reason to believe that Plaintiffs were performing hours of work for which they were not being compensated by Defendants. Id. at ¶ 94. Moreover, Defendants knew or had reason to believe that Plaintiffs were working in excess of forty hours per week on a regular basis. Id. at ¶ 95. Defendants typically scheduled Plaintiffs to work six days each week and otherwise assigned work each week to Plaintiffs that could not realistically be completed without working more than forty hours. Id. at ¶ 96.

By assigning such work, Defendants knew or had reason to believe that Plaintiffs were regularly working in excess of forty hours each week. Id. at ¶ 98. Accordingly, Defendants had constructive, if not actual, knowledge that Plaintiffs regularly-performed overtime work for which they were not compensated. Id. at ¶ 99.

In support of their claim under 42 U.S.C. § 1981, Plaintiffs Juan Sigui, Jose Sigui, Jose Cipriano, Joseph Mendez and Jose L. Santos allege that they are all members of the Hispanic race. Id. at ¶ 104. They also allege "on information and belief" that Defendants engaged in the practice

-10-

of intentionally hiring Hispanics as Field Service Technicians and subjecting them to the unlawful

wage and hour practices alleged herein based, in whole or in part, on their racial minority status.

Id. at ¶ 105.  They also assert that "less than 10% of Defendant M&M's Field Service Technicians

are white.  Such a disproportionate percentage of Hispanic employees can support a claim of

discrimination."  (Document No. 5 at p. 20 n.14). They also assert "[o]n information and belief,

Defendants were motivated in hiring Plaintiffs... by the belief that, in light of said Plaintiffs' racial

minority status, it was unlikely they would be aware of, assert, and/or seek means of redress for

violations of applicable law designed to protect employees."  Id. at ¶ 106.  And that, "[o]n

information and belief, Defendants would not have hired Plaintiffs...and subjected them to the

unlawful wage and hour practices alleged herein, but for, in whole or in part, their racial minority

status."  Id. at ¶ 107.

**ANALYSIS**

**A.     Employer Status of Cox**

The relevant provisions of the FLSA apply only to "employers" and their "employees."  The

FLSA's definition of employer is "any person acting directly or indirectly in the interest of an

employer in relation to an employee." 29 U.S.C. § 203(d).  Additionally, the FLSA recognizes the

concept of "joint employment," or a situation in which employers may share control of an employee

based on common or hierarchical control on behalf of the multiple employers. 29 C.F.R. § 791.2.

See also Chao v. Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007).  An employee is "any individual

employed by an employer."  29 U.S.C. § 203(e)(1).  The FLSA provides that a covered employer

shall not employ any employee "for a workweek longer than forty hours unless such employee

receives compensation for his employment in excess of the hours above specified at a rate not less

than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA provides a remedy for employees who have not been paid overtime compensation and states that an employer who violates § 207 "shall be liable to the employee or employees affected in the amount of their...unpaid overtime compensation...and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).

Cox first moves to dismiss Plaintiffs' claims brought under the FLSA and Rhode Island law[3] arguing that "[p]laintiffs clearly and unequivocally do not meet the pleading standard required by the First Circuit" because Plaintiffs do not identify their "direct employer" in the Amended Complaint.  (Document No. 15 at pp. 7-8).  M&M and Dowling rely on Cox's Motion, also requesting dismissal of the FLSA and state law claims because the Amended Complaint does not name the Plaintiffs' "direct employer."  (Document No. 17-1 at p. 3).

Defendants' argument is based on their interpretation of the First Circuit's decision in Cavallaro v. UMass Mem'l Healthcare, Inc., 678 F.3d 1, 9-10 (1st Cir. 2012).  Defendants allege that Cavallaro requires Plaintiff to identify her direct employer by name, before the Court can even consider a joint employment claim.  (Document No. 15 at p. 7).  Defendants argue that "[p]laintiffs clearly and unequivocally do not meet the pleading standard required by the First Circuit in Cavallaro because there is not a single allegation as to the name of the company that employs the five named plaintiffs." (Document No. 15 at p. 8).  The Court finds that Cavallaro's reasoning is not directly applicable to the present factual scenario.  In that case, the First Circuit concluded that the plaintiffs' failure to identify a direct employer from the larger group of defendants was a strategic

---

[3]  The Rhode Island Minimum Wage Act "is similar to the FLSA," and the Court considers both counts simultaneously.  See, e.g., Harbor Cruises LLC v. R.I. Dep't of Labor, No. PC 05-5076, 2008 R.I. Super. Lexis 142, *8 (R.I. Super Ct. Nov. 10, 2008).

decision to "prevent removal or broaden the potential class."  It ultimately determined that the plaintiffs should be permitted the opportunity to amend their Complaint.  In the present case, on the other hand, not only do Plaintiffs plainly identify their purported employers and provide significant details concerning the alleged interrelationship between M&M and Cox, but there is also no allegation that there is procedural gamesmanship involved in Plaintiffs' pleading.  In short, I do not read Cavallaro to present the brightline rule that Defendants argue.  Instead, as explained below, the determination of whether Plaintiffs have adequately pled that Defendants were joint employers must be made on a review of the Amended Complaint.

The Amended Complaint alleges that, "Defendant Cox exercised near total control and authority over the employment of the Plaintiffs and Class Plaintiffs."  (Document No. 5 at ¶ 62). While Cox argues that this is conclusory and overbroad and therefore fails to meet the relevant pleading standards, that argument ignores the fact that the FLSA's definition of "employer" is not limited to the common law definition, but must instead be given an expansive interpretation in order to effectuate the FLSA's broad remedial purpose. See Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998).

Whether an employment relationship exists under the FLSA is determined through the application of the multi-factor "economic reality" test and evaluation of the totality of the circumstances. See Baystate, 163 F.3d at 675 (adopting the economic-realities test). That test looks to four "regulatory factors" and roughly eight "nonregulatory factors" when determining the economic realities of a purported joint employment relationship.  In employing the economic realities test, the First Circuit focused on whether an alleged employer (1) has the power to hire and fire the alleged employee; (2) supervised and controlled employee work schedules or conditions of

-13-

employment; (3) determines the wage rate and method of payment; and (4) maintains employment records.  See Chesley v. DirectTV, No. 14-cv-468-PB, 2015 WL 3549129 (D.N.H. June 8, 2015) (citing Baystate, 163 F.3d at 675).  In applying the various factors outlined by the First Circuit, "the court has recognized that it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer."  Id. (internal citations omitted).

In their Amended Complaint, in terms of direct supervision and control, Plaintiffs exhaustively allege Cox's control over their work schedules, the order of individual jobs Plaintiffs were obligated to complete, and their compensation through a point system controlled by Cox, which allowed Cox to back-charge employees for work that Cox deemed was not performed properly. (Document No. 5 at ¶¶ 46, 56, 67, 79).  Additionally, Plaintiffs allege that Cox exerted direct control over many fundamental aspects of Plaintiffs' work in terms of insignia on Plaintiffs' uniforms and vehicles, Cox-provided equipment and documentation for customers, Cox-specific training and identification credentials specific to Cox.  Id. at ¶¶ 70-76.  Plaintiffs additionally allege that Cox conducted quality control after each completed cable installation job.  Id. at ¶ 76-77.  On this record, and in applying the "economic realities" test, I find that Plaintiffs have alleged sufficient facts to support a plausible claim of joint employment, and I recommend that the District Court find that Plaintiffs' claim survives the Defendants' Rule 12(b)(6) motions to dismiss.[4]

___

[4] The parties did not specifically brief Count III, the misclassification claim.  In their Objection, Plaintiffs assert that Defendants did not seek to dismiss Count III.  (Document No. 21-1 at p. 5, n.3).  In its Reply, Cox disputes Defendants' assertion and states that it is seeking dismissal of Count III, on the grounds that Cox cannot be liable for misclassification because it was neither Plaintiffs' employer nor joint employer.  (Document No. 24 at p. 2, n.1).  Because I have found that Plaintiffs' have pled sufficient facts to set forth a plausible claim that Cox was a joint employer, I also recommend that the Motion to Dismiss Count III be denied.

B.      **Minimum Wage and Overtime Violations**

The FLSA requires employers to pay a minimum wage and overtime to employees who are

employed in an enterprise engaged in commerce. 29 U.S.C. §§ 206, 207. An employer who violates

these provisions is liable to the affected employees for their unpaid wages and overtime

compensation, as well as for an equal amount as liquidated damages. Id. at § 216(b). The FLSA

further provides that "no employer shall employ any of his employees...for a workweek longer than

forty hours unless such employee receives compensation for his employment in excess of the hours

above specified at a rate not less than one and one-half times the regular rate at which he is

employed. 29 U.S.C. § 207(a)(1).

Cox and M&M next challenge Plaintiffs' overtime and minimum wage claims, which are

based in part on allegations that Plaintiffs (1) were routinely subjected to a wage rate that was less

than the applicable minimum wage because they were not compensated for all hours worked; (2)

were unlawfully deprived of overtime compensation; (3) were not reimbursed by Cox for necessary

business expenses; and (4) were subject to "charge backs" from their pay. (Document No. 5 at ¶¶

79-91). Cox and M&M argue that Plaintiffs have failed to plead a plausible claim insofar as

Plaintiffs have not alleged "at least one specific week in which they worked more than 40 hours but

were not paid overtime." (Document No. 15 at pp. 21-22; Document No. 24 at p. 17).

Defendants rely heavily on the standards for pleading overtime and wage claims under the

FLSA set forth by the First Circuit in Pruell v. Caritas Christi Network Servs., 678 F.3d 10, 12-14

(1st Cir. 2012). In Pruell, the plaintiffs alleged that they "regularly worked hours over 40 in a week

and were not compensated for such time." Id. at p. 13. The First Circuit held that, standing alone,

that statement was a "borderline" phrase, but was insufficient to survive a motion to dismiss because

-15-

it was "little more than a paraphrase of the statute." Id.  The First Circuit also considered whether the claim that the defendant required unpaid work through mealtimes cured the deficiency in the pleading.  Although it recognized that such an allegation "described a mechanism by which the FLSA may have been violated," it concluded that the complaint failed to provide examples of the type of work done during unpaid times or estimates as to the amount of unpaid time.  Id. at p. 14. As a result, the First Circuit concluded that the plaintiffs "could still have been properly compensated under the FLSA" because the work may not have been compensable under the FLSA, or the plaintiffs may have received additional compensation that offset any deficiency created by other uncompensated time.  Id.  The First Circuit concluded that the complaint was "deficient although not by a large margin."  Id.  Defendants argue that Plaintiffs' Amended Complaint is similarly deficient because it also fails to allege a single specific workweek during which Plaintiffs worked in excess of forty hours.

More recently, in Chesley, 2015 WL 3549129, the District of New Hampshire considered similar FLSA claims asserted by former employees against DirectTV.  In Chesley, the Plaintiffs provided estimates for the hours they worked, i.e., "approximately" fifty or sixty hours or "in excess of 60...." Id. at p. 6.  In that case, the plaintiffs also "alleged specific activities that they completed for which they were not compensated." Id.  In the present case, Plaintiffs state that they "regularly and consistently" worked more than forty hours per workweek.  (Document No. 5 at ¶ 80). Specifically, Plaintiffs assert that they were not compensated for:  (1) reporting to the Warwick facility when no work was assigned; (2) loading the work van at the start of the day and unloading the work van at the end of the day; (3) attendance at mandatory company meetings; (4) traveling to customers' homes or places of business; (5) waiting for assignment of work or to perform said work

for customers; (6) reporting to locations for work when the customers were not present and/or failed to show; (7) reporting to locations to advise customers that work could not be performed; (8) reporting to locations where they were unable to perform the work due to technological or other reasons; (9) performing additional, unscheduled and unassigned, tasks, including an on-site inspection of the customer's existing Defendant Cox services and repair of any deficiencies found; (10) returning to a location to complete, revise, or repair work previously performed; and (11) participating in and performing work during a multi-week unpaid training period at the start of employment.  Id. at ¶ 81.

In Chesley, the Court noted that "[a]lthough Twombly and Iqbal require more than 'a formulaic recitation of the elements of a cause of action,' they do not require plaintiffs to provide detailed factual allegations."  2015 WL 3549129 at *6 (citations omitted).  The Chesley Court continued "despite the defendants' argument that the plaintiffs failed to allege a single specific week for which they were not compensated, that level of detail is unnecessary at this stage.  See Davis v. Abington Mem'l Hosp., 765 F.3d 236, 243 (3rd Cir. 2014) ("'[W]e do not hold that a plaintiff must identify the exact dates and times that she worked overtime.')."  Id.  In the present case, Plaintiffs generally allege that they worked more than forty hours per week, and also provide sufficient detail as to specific tasks they allege were uncompensated.  Plaintiffs also assert that, if ordered to do so, they could amend their Complaint again to "add the numerous additional paragraphs...alleging specific week upon specific week in which each Plaintiff worked more than forty (40) hours...." (Document No. 22-1 at p. 17, n.12).  I do not recommend that Plaintiffs be required to take this step, because I find that the facts presently alleged are sufficient to support their overtime claim and to

survive this dismissal challenge.   Accordingly, I recommend that the District Court DENY Defendants' Motions to Dismiss the FLSA overtime compensation claim.

### C.    Liability of William Dowling

William Dowling has moved separately to dismiss the claims set forth by Plaintiffs. (Document No. 16-1).  In his Motion to Dismiss, Dowling argues that "Plaintiffs have failed to allege any specific facts that would suggest that [he] can be held personally liable under the economic realities test."  Dowling points out that he is only directly mentioned in two paragraphs of the Amended Complaint.  (Document No. 16-1 at p. 6). Specifically, the Amended Complaint alleges that Dowling was the General Manager of M&M, (Document No. 5 at ¶ 14), and that the "direct control exerted by Defendant M&M and Defendant Dowling with respect to the scheduling and recording of hours and payment to the Plaintiffs and Class Plaintiffs for time spent performing the work..." render him liable under the statutes.  Id. at ¶ 102. Dowling argues that this bare allegation is insufficient to render him personally liable and requests that the entirety of the Amended Complaint be dismissed as against him.  (Document No. 16-1 at p. 7).

In their Objection, Plaintiffs argue that the two paragraphs cited are not the only references to Mr. Dowling, but that he is also included in any paragraph that generally references the "Defendants."  (Document No. 21-1 at p. 36).  Plaintiffs point out that they have alleged that the Defendants "expressly instructed Plaintiffs...not to record more than forty (40) hours of time worked in any one workweek."  Id.  Plaintiffs assert that at this stage, the allegations in the Complaint are sufficient to state a claim, and Mr. Dowling's Motion should be denied.

Both parties argue that the First Circuit's decision in Baystate supports their position.  163 F.3d at 676-679.  In Baystate, the First Circuit noted that the "economic reality" test also applies to

the personal liability of corporate officers, and requires that the Court weigh elements including, "the significant ownership interest of the corporate officers; their operational control of significant aspects of the corporation's day to day functions, including compensation of employees; and the fact that they personally made decisions to continue operating the business....." Id. at pp. 677-678 (citing Donovan v. Agnew, 712 F.2d 1509 (1st Cir. 1983)).  The Court went on to note that, "… [a]t bottom, Agnew's economic reality analysis focused on the role played by the corporate officers in causing the corporation to undercompensate employees and to prefer the payment of other obligations and/or the retention of profits."  Id.

The First Circuit stated that other indicia of an individual being an "employer" are "an individual's operational control over significant aspects of the business and an individual's ownership interest in the business. Such indicia, while not dispositive, are important to the analysis because they suggest that an individual controls a corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA."  Id. In Manning v. Boston Med. Ctr. Corp., 725 F.3d 34, 48 (1st Cir. 2013), the First Circuit noted that "ownership stake" is "highly probative of an individual's employer status, as it suggests a high level of dominance over the company's operations....The company's profits...inure directly to an individual with an ownership interest, meaning that the individual 'employs' the worker in a very concrete and literal sense."  Manning, 725 F.3d at 48.   In Baystate, the First Circuit concluded that the individual defendants were not subject to liability as employers because there was no evidence that they "controlled [the company's] purse-strings or made corporate policy about [the Company's] compensation practices."  Id. at p. 679.

Where, as here, there is no allegation that the individual had an ownership stake in the company, the First Circuit has noted that "the allegations as to [the individual's] involvement in setting and enforcing the unlawful pay practices at issue become all the more important." Manning, 725 F.3d at 50.  In Manning, it concluded that, "[a]lthough there are such allegations against [the individual], they are nothing more than unadorned assertions that are not supplemented by specific allegations supporting the inference that [the individual] controlled [the company's] purse-strings or made decisions about the allocation of financial resources." Manning, 725 F.3d at 50.  It also "warned against" a "literal application of the definition of an employer..." which was defined as "simply the exercise of control by a corporate officer or corporate employee over the 'work situation,'" and would mean that "almost any supervisory or managerial employee of a corporation could be held personally liable for the unpaid wages of other employees and the civil penalty related thereto. We adhere to the view...that such an expansive application of the definition of an 'employer' to a personal liability determination pursuant to the FLSA is untenable." Id.

In the present case, even accepting the allegations against Mr. Dowling and Defendants as true, there is an absence of allegations that Mr. Dowling was "instrumental" in causing M&M to violate the FLSA, nor are there sufficient allegations that he controlled M&M's purse-strings. Instead, the Amended Complaint simply pleads that Mr. Dowling was akin to a managerial employee with "control...over the work situation," but not an "employer" in his right.  For these reasons, I find that the Amended Complaint fails to state a legally viable claim for individual liability against Mr. Dowling, and I recommend that the District Court GRANT his Motion to Dismiss in its entirety.

**D.     Claims Under 42 U.S.C. § 1981**

Finally, Defendants move to Dismiss Count IV, Plaintiffs' claim pursuant to 42 U.S.C. § 1981. "In order to prevail under Section 1981, a plaintiff must prove purposeful employment discrimination: the ultimate issue is whether the defendant intentionally discriminated against the plaintiff...." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996).  It is Plaintiff's burden to establish a prima facie case of discrimination under 42 U.S.C. § 1981, which requires a showing that "he was a member of a protected class and qualified for the employment he held, that his employer took an adverse employment action against him, and that his position remained open for (or was filled by) a person whose qualifications were similar to his." Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999).

In the present case, a recitation of the allegations in support of Plaintiffs' § 1981 claim reveals that such claims are based exclusively on "information and belief" allegations and fail to adequately plead a prima facie case of intentional discrimination.  In their Amended Complaint, Plaintiffs Juan Sigui, Jose Sigui, Jose Cipriano, Joseph Mendez and Jose L. Santos allege that they are members of the Hispanic race. (Document No. 5 at ¶ 104).  They also allege "[o]n information and belief, Defendants engaged in the practice of intentionally hiring Hispanics as Field Service Technicians and subjecting them to the unlawful wage and hour practices alleged herein based, in whole or in part, on their racial minority status." Id.  They also assert "[o]n information and belief, Defendants were motivated in hiring Plaintiffs...by the belief that, in light of said Plaintiffs' racial minority status, it was unlikely they would be aware of, assert, and/or seek means of redress for violations of applicable law designed to protect employees." Id. at ¶ 106.  Finally, Plaintiffs claim, "[o]n information and belief, Defendants would not have hired Plaintiffs...and subjected them to the unlawful wage and hour practices alleged herein, but for, in whole or in part, their racial minority status." Id. at ¶ 107.  In

support of this allegation, Plaintiffs rely on statistics: "[l]ess than 10% of Defendant M&M's Field Service Technicians are white.  Such a disproportionate percentage of Hispanic employees can support a claim of discrimination."  (Document No. 5 at p. 20, n.14. Plaintiffs then jump to the conclusion that Defendants have "intentionally discriminated against Plaintiffs...with respect to the terms and conditions of their employment on the basis of their race."  Id. at ¶ 108.

Defendants move to dismiss this count for a variety of reasons.  Having reviewed their Motions, the cases cited and the Amended Complaint, the Court recommends that this Count be DISMISSED because Plaintiffs' allegations do not satisfy the prima facie test.  First, even crediting their allegation that Plaintiffs were targeted for hire because they were Hispanic, the Court cannot give credence to the allegation that M&M would do so because it knew that Hispanic employees would be any less likely than other potential employees to assert their rights.  This is wild speculation not grounded in any factual averments.  Plaintiffs' Opposition to the Motion to Dismiss attempts to clarify their claims under § 1981.  Plaintiffs assert that Defendants "would not have hired [the Minority Plaintiffs] and subjected them to the unlawful wage and hour practices alleged herein, but for, in whole or in part, their racial minority status."  Id.  In rebuttal, Cox points out that Plaintiff has failed to "demonstrate any facts or inferences that address two of the key elements of the very standard they cite: that any of the Defendants took an adverse employment action against Plaintiff; or that the position remained open or was filled by someone with similar qualification." (Document No. 23 at pp. 4-5).  Cox also addresses Plaintiffs' claims regarding the statistics concerning the percentage of Hispanic employees of M&M versus the Rhode Island population as a whole.  Cox argues that Plaintiffs "fail[ ] to allege how this statistic relates to nonwhite employees being treated differently than white employees, which is the heart of a § 1981 claim. Plaintiffs instead seek to

bootstrap this statistic alone into a basis for an undefined § 1981 claim woven from their own cloth. However, Plaintiffs have failed to cite to a single case that suggests the hiring of members of a protected class over whites gives rise to a § 1981 claim." <u>Id.</u> at p. 5.

In short, the Amended Complaint does not set forth a cognizable claim under 42 U.S.C. § 1981. The claims are based exclusively on conclusory and unsupported "information and belief" allegations which are not sufficient to survive Defendant's 12(b)(6) challenge. Accordingly, I recommend that the District Court GRANT the Motion to Dismiss this claim.

**CONCLUSION**

For the reasons stated, I recommend that the District Court GRANT William Dowling's Motion to Dismiss (Document No. 16) in its entirety; and GRANT Cox and M&M's Motions to Dismiss solely as to Count IV, but otherwise DENY their Motions. (Document Nos. 15, 17).

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. <u>See</u> Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. <u>See United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1ˢᵗ Cir. 1986); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1ˢᵗ Cir. 1980).


   /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
October 20, 2015