UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                )
JUAN SIGUI; JOSE SIGUI;         )
JOSE CIPRIANO; JOSEPH MENDEZ;   )
JOSE L. SANTOS;                 )
and ANTHONY R. KERN, individually )
and on behalf of other similarly )
situated individuals,           )
                                )
         Plaintiffs,            )
                                )
    v.                          )   C.A. No. 14-442 WES
                                )
M + M COMMUNICATIONS, INC., alias; )
COX RHODE ISLAND TEL[E]COM, LLC, )
d/b/a COX COMMUNICATIONS, alias; )
and COXCOM, LLC, d/b/a          )
COX COMMUNICATIONS NEW ENGLAND, )
alias; and WILLIAM DOWLING, alias, )
                                )
         Defendants.            )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

Before the Court is Magistrate Lincoln D. Almond's Report and Recommendation ("R&R") (ECF No. 113) recommending that the Court grant Defendants Cox Rhode Island Telecom, LLC's and CoxCom, LLC's (collectively, "Cox") Motion for Summary Judgment (ECF No. 83) and deny Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF No. 89). Plaintiffs timely objected to the R&R (ECF No. 114) ("Objection"). After careful review of the R&R, Plaintiffs'

Objection, and the relevant papers,[1] the Court ACCEPTS the R&R and adopts its recommendations and reasoning. See 28 U.S.C. § 636(b)(1).

First, Plaintiffs argue that Magistrate Judge Almond contravened his duty to draw all reasonable inferences in favor of Plaintiffs (as the nonmovants) in construing Cox's Motion for Summary Judgment. (Pls.' Mem. in Support of Obj. to R. & R. ("Pls.' Obj.") 2.) Specifically, Plaintiffs posit that, "the R&R ignores all 265 of Plaintiffs' proffered undisputed facts—most of which are not disputed by Cox—and all but 8 of Plaintiffs' 104 disputed facts." (Id. at 14.) Plaintiffs appear to suggest that, when reviewing Cox's Motion for Summary Judgment, in addition to considering Cox's Statement of Undisputed Facts and Plaintiffs' responsive Statement of Disputed Facts, the magistrate judge must also consider Plaintiffs' Statement of Undisputed Facts submitted in support of their cross-motion for summary judgment. (See id.) Plaintiffs' argument is a nonstarter. Magistrate Judge Almond, as he was required to do, considered the factual record attached to Cox's motion in the light most favorable to Plaintiffs. (See R. & R. Part I.) In this context, the presence of cross-motions for

---

[1] The Court undertakes a de novo review of a properly filed objection to an R&R addressing a dispositive motion. See Emissive Energy Corp. v. SPA-Simrad, Inc., 788 F. Supp. 2d 40, 42 (D.R.I. 2011); Fed. R. Civ. P. 72(b)(3).

summary judgment does not alter the applicable framework. <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 6 (1st Cir. 2003). That is, "the court must mull each motion separately, drawing inferences against each movant in turn." <u>Id.</u> (citing <u>Blackie v. Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996)). Magistrate Judge Almond appropriately viewed the factual record set forth by Cox's motion, composed of Cox's Statement of Undisputed Facts and Plaintiffs' responsive Statement of Disputed Facts, through which Plaintiffs conceded several facts by either not responding at all or not responding with sufficient substance.[2] <u>See</u> DRI LR 56(a)(3) ("[A]ny fact alleged in the movant's Statement of Undisputed Facts shall be deemed admitted <u>unless expressly denied or otherwise controverted</u> by a party objecting to the motion." (emphasis added)).

Next, Plaintiffs posit that Magistrate Judge Almond "[i]mproperly relie[d] on other cases involving telecommunications

---

[2] This conclusion is unaffected by Plaintiffs' embellishment that their statement of undisputed facts in support of their cross-motion is also "in opposition to Defendants' Motion for Summary Judgment." The local rules of this Court contemplate an opportunity for the nonmovant to file a "separate Statement of Undisputed Facts" that sets forth "additional undisputed facts not contained in the moving party's statement of undisputed facts," with the key word being <u>additional</u>. <u>See</u> DRI LR 56(a)(4). Nothing in the local rules allows - or even remotely suggests - that plaintiffs can incorporate wholesale filings from other motions in this way.

installers, which are based on different facts and assumes that because in those cases a particular indicia of control, standing alone, did not indicate a joint-employer relationship[,] no combination of those indicia could lead to a determination that a joint-employer relationship exists." (Pls.' Obj. 2.) This specific averment goes hand in hand with a larger theme that fills Plaintiffs' fifty-seven-page objection: a suggestion that Magistrate Judge Almond neglected to consider the totality of the circumstances. (See, e.g., id. at 9-13, 16-17, 55-56.) Contrary to Plaintiffs' characterization of the R&R, Magistrate Judge Almond conducted what the Plaintiffs correctly recognize is required: a "pragmatic, holistic, totality-of-the-circumstances, economic-reality approach for joint-employment . . . ." (Pls.' Obj. 9-10.); see also Baystate Alternative Staffing, Inc. v. Herman, 163 F.3d 668, 675 (1st Cir. 1998) ("[T]o determine whether an employment relationship exists . . . courts look . . . to the 'economic reality' of the totality of the circumstances bearing on whether the putative employee is economically dependent on the alleged employer.").

To break down Plaintiffs' argument, it is helpful to start with the basics. This is important because Plaintiffs' suggestion that Magistrate Judge Almond applied the incorrect standard is premised upon a fundamental misconception of what that standard is. To be certain, the applicable standard in this context

dictates that, "it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." Baystate, 163 F.3d at 676; accord Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947) ("[T]he determination of the [employer-employee] relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."). In other words, using the four-factor standard adopted in Baystate as a guide, the court must holistically consider the case's circumstances to decipher whether the "'economic reality' of the situation" aligns with an employer/employee relationship. 163 F.3d at 675-77. This is precisely what Magistrate Judge Almond did. And his holistic analysis lead to the correct conclusion.

Plaintiffs' Objection to the R&R reveals that Plaintiffs' problem is not the standard applied but the conclusion reached. This Court has the benefit of not writing on a blank canvas; many courts have considered nearly identical arguments in nearly identical factual circumstances.[3] See generally, e.g., Crosby v. Cox Commc'ns, Inc., No. CV 16-6700, 2017 WL 1549552 (E.D. La. May 1, 2017); Gremillion v. Cox Commc'ns Louisiana, No. CV 16-9849,

_____

[3] Indeed, it is perplexing that Plaintiffs could, with a straight face, suggest that the cases followed by Magistrate Judge Almond (including those outlined, infra) are factually inapposite. (See Pls.' Obj. 17.) The Court has compared the facts of these cases to the present case and the similarities are manifest.

2017 WL 1321318 (E.D. La. Apr. 3, 2017); Roslov v. DirecTV Inc., 218 F. Supp. 3d 965 (E.D. Ark. 2016); Thornton v. Charter Commc'ns, LLC, No. 4:12CV479 SNLJ, 2014 WL 4794320 (E.D. Mo. Sept. 25, 2014); Zampos v. W & E Commc'ns, Inc., 970 F. Supp. 2d 794 (N.D. Ill. 2013); Valdez v. Cox Commc'ns Las Vegas, Inc., No. 2:09-CV-01797-PMP, 2012 WL 1203726 (D. Nev. Apr. 11, 2012); Lawrence v. Adderley Indus., Inc., No. CV-09-2309 SJF ETB, 2011 WL 666304 (E.D.N.Y. Feb. 11, 2011); Smilie v. Comcast Corp., No. 07-CV-3231, 2009 WL 9139890 (N.D. Ill. Feb. 25, 2009); Jacobson v. Comcast Corp., 740 F. Supp. 2d 683 (D. Md. 2010); Herman v. Mid-Atl. Installation Servs., Inc., 164 F. Supp. 2d 667 (D. Md. 2000), aff'd sub nom. Chao v. Mid-Atl. Installation Servs., Inc., 16 F. App'x 104 (4th Cir. 2001); Santelices v. Cable Wiring, 147 F. Supp. 2d 1313 (S.D. Fla. 2001). Each of those courts, in considering the totality of the circumstances of substantially analogous facts, granted summary judgment for the defendant-cable company. Magistrate Judge Almond considered these decisions, where other federal district courts principally tested the facts and arguments against the same four-factor standard. And he correctly deemed them highly persuasive. Like Magistrate Judge Almond, this Court finds these cases highly persuasive, and Plaintiffs have not convincingly explained why the circumstances of this particular case are any different than the near-dozen cases in which summary judgment was granted on the issue of joint-employment on practically identical

facts.

The best Plaintiffs can do is to exclusively rely on an outlier case, <u>Perez v. Lantern Light Corp.</u>, No. C12-01406 RSM, 2015 WL 3451268 (W.D. Wash. May 29, 2015). (<u>See, e.g.</u>, Pls.' Obj. 13-19, 23, 28, 31, 40, 47.) Alas, the persuasiveness of this case does not increase with the number of times Plaintiffs cite to it in their objection. Plaintiffs suggest that Magistrate Judge Almond, in refusing to follow this case's reasoning, "[i]mproperly reject[ed] the most authoritative and factually apposite case . . . merely because M+M's contract with Cox was not exclusive, even though M+M has never worked for another cable company and is totally economically dependent upon Cox . . . ." (Pls.' Obj. 2.) But each fact that Plaintiffs attach significance to from <u>Perez</u> is present in abundance in the other cases in which summary judgment was granted, and – as Magistrate Judge Almond recognized – this case is factually distinguishable from <u>Perez</u> in more fundamental and material ways. (<u>See</u> R. & R. 18 n.2.); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). For instance, Plaintiffs pinpoint a "laundry list of similar facts" shared

between the instant case and <u>Perez</u>, including, among other things, Cox requiring background checks, qualifications to install cable, collecting quality control data on installers, requiring uniforms, badges, and logos on vehicles, and providing payment on a "piece rate." (Pls.' Obj. 15.) Just as these facts did not compel the conclusion that cable companies were joint employers in other, factually similar cases, they do not do so here. <u>See, e.g.</u>, <u>Crosby</u>, 2017 WL 1549552, at *5 ("But simply requiring a background check has not been found sufficient to conclude that a communication company possesses authority to hire and fire."); <u>id.</u>, at *7 ("[T]he purpose of identifying Cox on the technician's badge and vehicle is to ensure customer safety and the purpose of the surveys and quality control checks is to ensure satisfaction of Cox customers. These examples do not amount to day to day supervision or control of a . . . technician's schedule or working conditions."); <u>Zampos</u>, 970 F. Supp. 2d at 804 ("Plaintiffs argue that Comcast plays a significant role in determining how much W & E technicians are paid simply because it pays W & E on a per service basis, itemizes how long work tasks should take, and associates point value and hourly rates for each job. The Court rejects this argument."); <u>Jacobson</u>, 740 F. Supp. 2d at 692 ("An employee's income, received from its direct employer, will always be determined and influenced by what a contractor decides to pay the direct employer for services rendered by the employee."); <u>id.</u> at

690 ("Therefore, detailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship.").

Perez is distinguishable in more significant ways. Despite Plaintiffs' attempt to minimize this fact, as Magistrate Judge Almond recognized, it matters that this case lacks the "exclusivity language" present in Perez. 2015 WL 3451268, at * 6 (noting DirecTV "Services Provider Agreement" included "exclusivity language" that "forbade [installation company] and its Installers from serving companies offering comparable programming or television services"); cf. Crosby, 2017 WL 1549552, at *5 ("Importantly, because the contract with Cox is not exclusive, [the installation company] is not precluded from obtaining other installation work . . . ." (emphasis added)). Here too, it is undisputed that the installation company, M+M, could have chosen to contract with other cable companies. (Compare Pls.' Statement of Disputed Facts, ECF No. 88-2, with Cox's Statement of Undisputed Facts, ECF No. 84, ¶ 17.) Like the many courts before it to consider – and reject - Plaintiffs' exact argument, the Court is not persuaded that Cox is a joint employer of M+M simply because M+M chose to only perform work for Cox. (See Pls.' Obj. 16); see also Thornton, 2014 WL 4794320, at *2 (granting summary judgment despite that cable company was installation company's only customer where "the Agreement did not bar [installation company]

from contracting with other cable or satellite installation companies"); Zampos, 970 F. Supp. 2d at 805 ("W & E's apparent dependence on Comcast simply does not translate into functional control by Comcast over W & E technicians."); Jacobson, 740 F. Supp. 2d at 693 ("Installation Companies work primarily, if not exclusively, for Comcast. However, . . . a single client base is not a proxy for joint employment because it is 'perfectly consistent with a legitimate subcontracting relationship.'" (quoting Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003))).

What remains of Plaintiffs' Objection is simply a parroting of arguments previously made to Magistrate Judge Almond — arguments that he appropriately rejected. While review of the Magistrate Judge's R&R is de novo, it is not an opportunity to re-run every argument made to the Magistrate Judge. See Sackall v. Heckler, 104 F.R.D. 401, 402-03 (D.R.I. 1984) ("[I]f the magistrate system is to be effective, and if profligate wasting of judicial resources is to be avoided, the district court should be spared the chore of traversing ground already plowed by the magistrate [judge] except in those areas where counsel . . . can in good conscience complain to the district judge that an objection to a particular finding or recommendation is 'well grounded in fact and is warranted by existing law . . . .'" (quoting Fed. R. Civ. P. 11)); see also Gonzalez-Ramos v. Empresas Berrios, Inc., 360 F. Supp. 2d 373, 376

(D.P.R. 2005) ("The objections . . . are not to be construed as a second opportunity to present the arguments already considered by the Magistrate-Judge."). Magistrate Judge Almond considered the totality of the circumstances of this case in the light most favorable to Plaintiffs through the four-factor test from Baystate. (See R. & R. 15-22.) In spite of Plaintiffs' Objection, the Court is satisfied with his analysis and adopts it. The Court has considered Plaintiffs' other arguments, which it deems unpersuasive.

Accordingly, the Court GRANTS Cox's Motion for Summary Judgment (ECF No. 83). Plaintiffs' Cross-Motion for Summary Judgment (ECF No. 89) is therefore DENIED.

IT IS SO ORDERED.

_William E. Smith_
Chief Judge
Date: March 30, 2018

JUAN SIGUI, et al.                              :
                                                :
v.                                              :       C.A. No. 14-442-WES
                                                :
M&M COMMUNICATIONS, INC.,                       :
et al.                                          :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

Pending before me for a report and recommendation (28 U.S.C. § 636(b)(1)(B)) are Defendant Cox Rhode Island Telecom, LLC and Coxcom, LLC's (collectively "Cox") Motion for Summary Judgment (ECF Doc. No. 83) and Plaintiffs' Combined Cross-Motion for Summary Judgment and Objection to Cox's Motion. (ECF Doc. No. 89). In this Motion, Cox maintains that, as a matter of law, it was not Plaintiffs' employer under either the Fair Labor Standards Act ("FLSA") or the Rhode Island Minimum Wage Act ("RIMWA"), and thus it must be dismissed as a Defendant in this lawsuit. For the following reasons, I recommend that Cox's Motion (ECF Doc. No. 83) be GRANTED and Plaintiffs' Cross-Motion (ECF Doc. No. 89) be DENIED.

### I.      Facts

Cox provides cable, telephone, internet and communication services to residents and businesses in the state of Rhode Island and throughout parts of the United States. (ECF Doc. No. 84 at ¶ 1). Third-party cable installation companies provide installation and maintenance services to Cox's customers. Id. at ¶ 2. Cox customers buy services and cable equipment from Cox in order to have access to television, internet and/or telephone services in their homes. Id. at ¶ 3. M+M, founded in 1996, is engaged in the cable, Internet, telephone and telecommunications installation business. Id. at ¶ 4. Cox contracted with M+M to perform installation and maintenance services on

cable television, internet, telephone lines and equipment to Cox customers throughout Rhode Island. Id. at ¶ 5.

Since 2011, Cox entered into four Field Service Agreements ("FSAs") with M+M, each of which governed the terms of their business relationship. Id. at ¶ 6. Under the terms of the FSA, M+M provided installation and maintenance services to Cox through M+M's Field Service Technicians (hereinafter "Technicians"). Id. at ¶ 7. The FSAs between Cox and M+M stated that M+M's Technicians were independent contractors and not employees of Cox. Id. at ¶ 8. The FSAs also state that "[c]ontractor's obligations to comply with Applicable Laws does not create the relationship of employer-employee between Cox and either Contractor or any of Contractor's Personnel." Id. at ¶ 10. The FSAs state that neither M+M, "nor its Personnel is, nor shall become, Cox's employee or agent, and that this Agreement does not establish a partnership or joint venture between either Contractor and Cox or Contractor's Personnel and Cox." Id. at ¶11. Cox and M+M each have their own owners, officers, directors, managers, supervisors, policies and procedures. Id. at ¶ 12. Cox has no ownership interest or financial interest in M+M, and M+M has no ownership interest or financial interest in Cox, nor does Cox reimburse M+M for any of its business expenses. Id. at ¶ 13.

M+M is owned by Michael Jackman and was managed by Defendant William Dowling ("Dowling"), General Manager, at all relevant times. Id. at ¶ 14. M+M's facility is located in Warwick, Rhode Island and also has related operations throughout the United States. Id. at ¶ 15. Cox required M+M to store the materials necessary to perform work for Cox at M+M's facility; and to ensure it was properly staffed, climate controlled and fire-protected. (ECF Doc. No. 88-2 at ¶ 15). Cox's Rhode Island facility is located in West Warwick, Rhode Island; M+M does not have any interest in Cox's offices. (ECF Doc. No. 84 at ¶ 16). M+M is not required to work only for Cox. Id. at ¶ 17. Although M+M is not required to work only for Cox, M+M has worked solely for Cox since 2011. Id. at ¶ 18.

M+M has its own dispatch personnel and supervisory personnel who work with and monitor M+M's Technicians; none of M+M's employees are directly employed by Cox or report to anyone employed by Cox. Id. at ¶ 19. Cox monitored M+M's compliance with its requirements by holding weekly meetings with Dowling. (ECF Doc. No. 88-2 at ¶ 19). M+M develops its own personnel policies; these personnel policies differ from Cox's personnel policies. (ECF Doc. No. 84 at ¶ 20). During its contractual relationship with Cox, M+M provided services to Cox through skilled Technicians (including many Technicians with prior cable installation experience) who were hired or contracted solely by M+M. Id. at ¶ 21. The FSA set forth certain standards that a potential M+M hire must meet including: passing a background check, drug screening, identifying verification and various other requirements. (ECF Doc. No. 88-2 at ¶ 3). At all relevant times, Cox had the authority to, "at any time without cause upon at least fourteen (14) days' prior written notice to Contractor," terminate its relationship with M+M. (ECF Doc. No. 84 at ¶ 22).

Plaintiff Juan Carlos Sigui worked with M+M as a Technician in June 2010 and was fired by Dowling, M+M's General Manager, in 2012; was again hired by M+M by Dowling shortly thereafter in 2012 and worked as a Technician for M+M until he was again fired by Dowling in May 2014. Id. at ¶ 23. Plaintiff Jose Sigui worked with M+M as a Technician from 2010 until he was fired by Dowling on May 10, 2014. Id. at ¶ 24. Plaintiff Jose Santos worked with M+M as a Technician from 2009 to 2014, when he submitted his voluntary resignation to M+M. Id. at ¶ 25. Plaintiff Joseph Mendez worked with M+M as a Technician from February 2009 until early 2013 when he was terminated from M+M by Dowling; Joseph Mendez was again hired by M+M shortly thereafter in early 2013 and remained at M+M as a Technician until he was fired by Dowling on January 17, 2014 for refusing to drive a route to western Rhode Island. Id. at ¶ 26. Jose Cipriano worked with M+M as a Technician from 2010 until he was fired from M+M by Dowling in May 2014. Id. at ¶ 28.

Cox did not hire, or instruct M+M to hire, M+M's Technicians, nor did it have the authority to do so. Id. at ¶ 32. Plaintiffs completed M+M applications to work for M+M. Id. at ¶ 33.

Plaintiffs submitted their completed applications to M+M, not Cox. <u>Id.</u> at ¶ 34. Plaintiffs submitted resumes, if any, to M+M, not Cox. <u>Id.</u> at ¶ 35. Plaintiffs did not submit any documents of any kind to Cox during their application process with M+M. <u>Id.</u> at ¶ 36. Once an individual was hired by M+M, Cox stored their name and unique Identification Number, as well as results from the "Qualified Cox Contractor Requirements Program," including various background checks. (ECF Doc. No. 88-2 at ¶ 36). Plaintiffs were interviewed, if at all, by Dowling at M+M's facilities. (ECF Doc. No 84 at ¶ 37). Plaintiffs were not interviewed by any Cox employee nor were their interviews conducted on Cox's premises. <u>Id.</u> at ¶ 38. Plaintiffs did not speak with any Cox employee during the hiring process by M+M. <u>Id.</u> at ¶ 39. Plaintiffs were hired by Dowling to work as Technicians for M+M. <u>Id.</u> at ¶ 40. No Cox employee hired Plaintiffs to work for M+M. <u>Id.</u> at ¶ 41. After being hired by M+M, M+M Technicians signed paperwork prepared by M+M and submitted new hire paperwork to M+M, not Cox. <u>Id.</u> at ¶ 42. After being hired by M+M, but before performing work for Cox customers, Plaintiffs completed a criminal background check and drug screening to ensure the safety of Cox's customers. <u>Id.</u> at ¶ 43. After being hired by M+M, but before performing work for Cox customers, M+M Technicians were required to meet the Cox Qualified Contractor Requirements Program, which required that they take a certification exam at M+M's facility. <u>Id.</u> at ¶ 44. For an M+M Technician to be authorized to perform work for Cox customers, the M+M Technician was required to submit to a criminal background check, drug screen and certification, as well as other tests within Cox's discretion. <u>Id.</u> at ¶ 45; (ECF Doc. No. 88-2 at ¶ 45). The criminal background check and drug screening are performed by a third-party vendor, InfoMart, who provides the results of such testing to M+M, not Cox. (ECF Doc. No. 84 at ¶ 46). M+M informed Cox that Plaintiffs satisfactorily completed the background check, drug screen and certification process, and Cox then authorized Plaintiffs to perform work for Cox's customers. <u>Id.</u> at ¶ 47. Cox then issued technician numbers and identification badges. <u>Id.</u> at ¶ 48.

M+M fired Plaintiffs, and other M+M Technicians, without first advising Cox and without Cox's input. Id. at ¶ 49. No Plaintiff was fired by a Cox employee. Id. at ¶ 51. Cox did not have the authority to terminate, nor did it suggest M+M terminate, any Plaintiff's relationship with M+M; rather, Cox only had the authority to de-authorize an M+M Technician from performing services for Cox "if there is a violation of law, a customer grievance or other reason affecting the safety of Cox's customers or the quality of Cox's services…" Id. at ¶ 52. M+M was free to retain any Technician de-authorized by Cox to serve in another capacity for M+M. Id. at ¶ 52(a).

Cox customers in need of Cox services contacted Cox, by telephone or on the Internet, to request services. Id. at ¶ 53. Cox's customers decide on a two-hour window of time for a service call. Id. at ¶ 54. After a customer requests services, a work order for each request is generated in ICOMS, Cox's billing system. Id. at ¶ 56. Only M+M Managers and Dispatchers – not M+M Technicians – have access to ICOMS. Id. at ¶ 57. M+M would report to Cox on a daily basis with respect to the number of Technicians, and each Technician's Identification Number, it had available for work on a given day. Id. at ¶ 58.

Prior to 2014, Cox's work orders were routed, in bulk fashion, to M+M. Id. at ¶ 59. Prior to 2014, after receiving batches of work orders from Cox via ICOMS, M+M assigned work orders to its Technicians at M+M's sole discretion. Id. at ¶ 60. In and after 2014, information regarding Cox's work orders in ICOMS is placed into a web-based automatic routing computer program called "ETA." Id. at ¶ 61. ETA is not a proprietary program of Cox. Id. at ¶ 62. M+M Technicians who were authorized to perform services for Cox customers each had an Identification Number assigned by Cox. Id. at ¶ 63. The ETA system would then shuffle work orders to M+M, placing work orders under a Technician Number. Id. at ¶ 64. M+M was then able to manipulate the work orders in ETA and would assign work orders to its Technicians at its discretion. Id. at ¶ 65. Cox was not informed of changes made to ETA routing by M+M, did not monitor or track changes made to ETA auto-

routing and did not utilize or review ETA. Id. at ¶ 66. At no time did Cox assign work orders to any of M+M's Technicians. Id. at ¶ 67.

Every workday morning M+M Technicians, including Plaintiffs, reported to work at M+M's facilities between 7:30 and 8:00 a.m. Id. at ¶ 69. Plaintiffs were required by M+M, and not Cox, to report to the M+M facility each morning. Id. at ¶ 70. Upon arriving at M+M's facility in the morning, Plaintiffs would return to M+M any equipment they did not use the prior work day. Id. at ¶ 71. M+M Technicians, including Plaintiffs, would wait at M+M's facilities from their time of arrival until Dowling provided them with work assignments for the day. Id. at ¶ 72. Each morning, Dowling spent between thirty minutes to 1.5 hours accessing ICOMS or ETA to assign work orders to M+M Technicians. Id. at ¶ 73. Even when M+M Technicians, including Plaintiffs, had access to ETA, they had to wait for Dowling to provide their work assignments. Id. at ¶ 74. At all times, M+M had complete control over how the work orders were assigned to M+M Technicians, including Plaintiffs, and determined Plaintiffs' schedules based on Plaintiffs' personal preferences and to maximize efficiency. Id. at ¶ 75.

Plaintiffs, and other M+M Technicians, received ETA and/or ICOMS printouts showing the work orders they were assigned to complete for the day from M+M through Dowling and/or M+M dispatchers. Id. at ¶ 77. Once Plaintiffs received their daily work orders from Dowling, Plaintiffs went to M+M's warehouse to pick up the equipment required to complete their work orders for the day. Id. at ¶ 78. After retrieving their equipment from M+M's warehouse, Plaintiffs traveled to customer homes to complete their work orders without the supervision of any Cox employee. Id. at ¶ 79.

During the day, Dowling and M+M's dispatchers could make changes to Technicians' work schedules, taking away or adding work orders without notifying Cox. Id. at ¶ 80. Plaintiffs, and other M+M Technicians, were required to call an M+M dispatcher at the end of the day before going home to notify M+M that their work orders were complete. Id. at ¶ 81. If an M+M Technician used an

M+M van to complete their work, the M+M Technician was required to return the van to M+M at the end of their work day.  Id. at ¶ 82.  If Plaintiffs were running late to work, wanted to leave work early, wanted time off of work for sick leave or vacation, or had questions about their schedules, they contacted M+M.  Id. at ¶ 83.  If an emergency arose and Plaintiffs needed to leave work or call out of work, they would contact Dowling at M+M, not Cox.  Id. at ¶ 84.  M+M Technicians were trained by M+M personnel, not by Cox.  Id. at ¶ 85.

Cox provided the training materials and required M+M to provide specific types and content of training to Technicians.  Cox also required M+M to verify that Technicians completed the required training.  (ECF Doc. No. 88-2 at ¶ 85).  M+M Technicians who lacked recent experience in cable installation received training, when they began work for M+M, that included riding along with an experienced M+M Technician for several days. (ECF Doc. No. 84 at ¶ 86.  Cox did not conduct training for M+M's Technicians.  Id. at ¶ 87.  Cox provided training and/or product information only to M+M's management, not to M+M's Technicians, such as Plaintiffs.  Id. at ¶ 88.

Cox did not instruct M+M on how to train its personnel.  Id. at ¶ 89.  M+M required Plaintiffs to attend weekly training meetings conducted by Dowling and held at M+M's facility.  Id. at ¶ 90.  Cox did not require M+M Technicians, including Plaintiffs, to attend training.  Id. at ¶ 91.  M+M conducted weekly mandatory meetings for its Technicians that Cox's manager of vendor management would sometimes observe and attend.  Cox would not schedule any work for Technicians during this scheduled M+M meeting.  (ECF Doc. No. 88-2 at ¶ 91).  There were only, at most, two meetings at M+M in which a Cox employee spoke.  (ECF Doc. No. 84 at ¶ 92).  On one of these occasions the Cox employee spoke only to state he did not "have to talk to you [Technicians]" because he was present to speak with M+M management, not its Technicians.  Id. at ¶ 93.  M+M, not Cox, instructed Plaintiffs to complete online training through Skillport.  Id. at ¶ 94.

M+M Technicians' work performance was supervised by M+M personnel.  Id. at ¶ 95.  Cox monitored and evaluated Technicians' performance to ensure that it met performance standards

established by Cox. (ECF Doc. No. 88-2 at ¶ 95). Plaintiffs were supervised by Shawn Harrell, an M+M Supervisor; Pedro Arias, an M+M Supervisor; and Dowling. (ECF Doc. No. 84 at ¶ 96). In April or May 2014, M+M promoted Plaintiff Juan Sigui to a supervisory position over M+M's Technicians, and increased his rate of pay; Cox was not aware of, and did not have any input regarding, Juan Sugui's promotion. Id. at ¶ 97. For two weeks, at the end of his employment, Plaintiff Juan Sigui supervised Plaintiffs and other M+M Technician's work performance. Id. at ¶ 98. Cox had no involvement or input with respect to M+M's decision to promote Plaintiff Juan Sigui. Id. at ¶ 99. Cox did not instruct M+M with respect to its decisions to promote and/or demote M+M Technicians, nor did Cox have the authority to do so. Id. at ¶ 100. No Cox employee supervised Plaintiffs' work performance. Id. at ¶ 101.

While M+M Technicians are required to install Cox equipment according to specifications, the specifications are required to ensure adherence to national electric codes and the safety of Cox's customers. Id. at ¶ 103. Cox did not discipline Plaintiffs or any M+M Technicians. Id. at ¶ 104. Only M+M instructed Plaintiffs with respect to Plaintiffs' work performance; Cox did not instruct Plaintiffs with respect to their work performance. Id. at ¶ 105. M+M coached its Technicians regarding performance deficiencies without Cox's knowledge or direction. Id. at ¶ 106. Cox did not evaluate Plaintiffs' work performance. Id. at ¶ 107.

Cox did not provide any documents or paperwork to any M+M Technician, including Plaintiffs. Id. at ¶ 108. Plaintiffs did not submit any paperwork to Cox throughout their tenure with M+M. Id. at ¶ 109. All documents received and/or obtained by Plaintiffs regarding their work for M+M was provided to Plaintiffs by M+M, not Cox. Id. at ¶ 110. Cox did not instruct Plaintiffs, or other M+M Technicians, in how to perform their work. Id. at ¶ 111. Cox did not tell Plaintiffs, or other M+M Technicians, what to say to Cox customers. Id. at ¶ 112.

In the four years that Plaintiff Juan Sigui worked at M+M: (a) he spoke with Stuart Moody, a Cox employee, only once, during a meeting; and (b) he interacted with Kathy Smith, a Cox lead

bucket truck Technician, only two times, once when Smith was at a customer home and she asked Juan Sigui for assistance and once when Juan Sigui arrived at Smith's father's home to complete a job. Id. at ¶ 113. Plaintiff Jose Sigui only spoke to a Cox employee on four occasions in his four years of work at M+M, (a) he interacted with Smith one time in his four years of work for M+M to discuss a cable line; and (b) he had two conversations with Richard Sheehan[1] when Jose Sigui went to Cox's premises to obtain his work badge and to calibrate his meter, (c) he spoke with Tony Oliveria one time in which he complained to Tony Oliveria that he made a comment about a loose fitting at the pole. Id. at ¶ 114. During Plaintiff Jose Santos's five years at M+M, other than seeing Tony Oliveria on occasion, he only saw Smith and Stuart Moody once each. Id. at ¶ 115. During Plaintiff Jose Cipriano's four-year tenure with M+M he spoke with a Cox employee on only two occasions: (a) he interacted with Tony Oliveria on only one occasion; and (b) he interacted with Smith only one time, when he arrived at a customer site to assist her in completing a work order. Id. at ¶ 116. During Plaintiff Joseph Mendez's more than four years at M+M, he did not interact with a single Cox employee. Id. at ¶ 117.

Kevin O'Connell is Cox's Director of Vendor Management and was the Manager of Vendor Management for Cox's operations in Rhode Island at all relevant times and was responsible for Cox's third-party contractors in Rhode Island, Connecticut and Cleveland, Ohio. Id. at ¶ 119. Cox supervisors were not present and/or did not supervise Plaintiffs when they installed equipment in customer homes. Id. at ¶ 120. Plaintiffs did not see or interact with Kevin O'Connell during their respective tenures with M+M. Id. at ¶ 121. At their hire, Dowling set and informed Plaintiffs of their rate and method of pay. Id. at ¶ 122. Cox did not pay Plaintiffs. Id. at ¶ 123. Cox did not instruct M+M with respect to how to pay its Technicians and had no input into Plaintiffs' pay structure. Id. at ¶ 124. Cox paid M+M, according to the terms of the applicable FSA, under a point-based system. Id. at ¶ 125. Cox did not determine how M+M paid Plaintiffs under the FSAs or

---

[1]     Richard Sheehan was a Supervisor for Vendor Management over Connecticut and Cleveland, Ohio; Richard Sheehan had no responsibility regarding Cox's vendors in Rhode Island.

otherwise. Id. at ¶ 126. Cox was not aware of how, and had no involvement with respect to how, M+M paid its Technicians. Id. at ¶ 127. The FSAs between Cox and M+M do not have any terms with respect to how M+M pays its Technicians. Id. at ¶ 128. M+M had sole discretion and authority in determining how to pay its Technicians. Id. at ¶ 129. Cox did not instruct M+M with respect to how it paid its Technicians. Id. at ¶ 130. Cox did not issue paychecks to Plaintiffs. Id. at ¶ 131. M+M issued paychecks to its Technicians, including Plaintiffs. Id. at ¶ 132. M+M, and not Cox, issued Plaintiff's IRS Forms W-2 and/or 1099, and Plaintiffs identified M+M as their employer on their respective tax returns. Id. at ¶ 133. M+M Technicians did not discuss their pay with Cox. Id. at ¶ 134. No Cox employee ever spoke to any Plaintiffs regarding their pay or provided Plaintiffs any documents regarding their pay. Id. at ¶ 135.

M+M Technicians, including Plaintiffs, did not receive any employment benefits (e.g., vacation) or insurance coverage (i.e., liability insurance, workers' compensation insurance, vehicle insurance or medical, dental or health insurance) from Cox. Id. at ¶ 136. M+M independently determined whether to back charge Plaintiffs for improperly completed work, and Plaintiffs were informed of alleged chargebacks by M+M, and not Cox. Id. at ¶ 137. Cox did not instruct M+M to back charge or otherwise instruct Cox to deduct amounts from any Plaintiff (or any M+M Technician), nor did it have the authority to do so. Id. at ¶ 138. M+M Technicians were promoted and/or demoted solely by M+M. Id. at ¶ 139. Plaintiff Juan Sigui was promoted by M+M to the position of Supervisor, and provided a raise by M+M, in the last two weeks of his tenure with M+M. Id. at ¶ 140. Cox has no authority with respect to the decision by M+M to promote and/or increase the pay of M+M's Technicians and was not aware of and did not have any input into his promotion by M+M. Id. at ¶ 141.

Plaintiffs' time sheets were submitted to, and are maintained by, M+M. Id. at ¶ 142. No Cox employee instructed any Plaintiff regarding how to complete their respective time sheets, nor was Cox aware of the hours worked by Plaintiffs at M+M. Id. at ¶ 143. The only information pertaining

to Plaintiffs retained by Cox is the information relevant to each Plaintiff's identification badge (i.e., Plaintiffs' names and Technician Identification Numbers) and the quality control information stored on an application called QEDataMax. Id. at ¶ 144. Cox did not retain Plaintiffs' personal identifying information. Id. at ¶ 145. Cox does not maintain employment records (personnel files, payroll records, performance evaluations and benefits information) for M+M's Technicians. Id. at ¶ 146.

Plaintiffs did not work at or out of Cox's facilities. Id. at ¶ 147. The only time Plaintiffs were on Cox's premises was to obtain their identification badge and, on one occasion, to calibrate a meter needed to work with Cox equipment. Id. at ¶ 148. Plaintiffs worked out of M+M's facility. Id. at ¶ 149. With regard to the specific cables, modems and other equipment that M+M Technicians install in customer homes, Cox supplies M+M with this equipment in bulk fashion, and M+M stores the equipment in its warehouse and distributes it to its Technicians at its discretion. Id. at ¶ 150. Plaintiffs paid for the vehicles they used when working as Technicians at M+M, including all vehicle maintenance and insurance costs. Id. at ¶ 151. Plaintiffs used their own tools (including drills, meters, ladders and hand tools) when completing work for M+M. Id. at ¶ 152. Cox did not provide any tools to Plaintiffs; a Cox vendor provided Jose Cipriano a pair of crimpers, Jose Mendez a "compression tool," and Jose Sigui a pair of crimpers and a torque wrench. Id. at ¶ 153. M+M, and not Cox, was responsible for M+M Technicians' equipment and materials. Id. at ¶ 154. Cox equipment (i.e., the cable equipment that its customers had purchased or leased from Cox to be installed in their homes) must be used to provide Cox services. Id. at ¶ 155.

Cox required M+M, when performing services for Cox, to use a logo identifying M+M as a vendor for Cox "for our customer's safety and security reasons." Id. at ¶ 156. Plaintiffs were required to wear a uniform by M+M. Id. at ¶ 157. Either Plaintiffs paid for their uniforms, or M+M provided uniform shirts to Plaintiffs which stated "M+M" and "contractor" for Cox. Id. at ¶ 158. At all relevant times, M+M was required to have a safety program in place, in compliance with Cox Contractor Environmental, Safety and Health Program. Id. at ¶ 159. M+M was also required to

comply with the National Quality Control Program "to ensure the safety of Cox customers, to ensure the reliability of service to Cox customers, both individually and collectively, to make sure that the customer is satisfied." Id. at ¶ 160. Cox required M+M to complete a "Certificate of Compliance" affirming that it was "in compliance with the FLSA and applicable wage and hour laws for the states in which it has contracted to do work with Cox, including…Rhode Island…." Id. at ¶ 161.

Cox performed random quality control inspections of work completed by M+M Technicians to ensure the safety and satisfaction of its customers and to ensure M+M provided the services it was contractually obligated to provide. Id. at ¶ 162. Cox performed quality control inspections on 2% to 2.5% of the work completed by M+M Technicians. Id. at ¶ 163. Tony Oliveria was Cox's Quality Control Supervisor responsible for M+M. Id. at ¶ 164. The only time that a Cox employee was present at customer homes in which Plaintiffs were working was to conduct random quality control inspections. Id. at ¶ 165. Plaintiffs did not interact with Tony Oliveria, beyond small pleasantries. Id. at ¶ 166. Tony Oliveria did not instruct Plaintiffs with respect to any work rules, nor did he supervise Plaintiffs' work performance. Id. at ¶ 167.

No Cox employee discussed customer surveys, customer complaints or quality control issues with Plaintiffs. Id. at ¶ 168. If Cox received a customer complaint regarding an M+M Technician, Cox forwarded that complaint to M+M's management. Id. at ¶ 169. Customer complaints were forwarded from Cox to M+M management so that M+M could use that information at M+M's sole discretion. Id. at ¶ 170. Cox also relayed the information it received through its random quality control inspections, to M+M's management, and it was then solely up to M+M to manage its Technicians and take action as M+M deemed appropriate. Id. at ¶ 171. Cox conducted quality control inspections to ensure that its equipment was being installed correctly and in a safe manner and to ensure its customers were satisfied. Id. at ¶ 172. For safety reasons, and to ensure the customers feel at ease, M+M required Plaintiffs to display a Cox logo on their work vehicles. Id. at ¶ 173. For safety reasons, Plaintiffs were required to wear a badge that stated "M+M" and "Contractor

for Cox Communications" when Plaintiffs performed work for M+M at Cox's customers' homes. Id. at ¶ 174. Plaintiffs wore a badge identifying them as Cox contractors so that customers knew Plaintiffs were authorized to work on Cox equipment when they arrived at customers' homes. Id. at ¶ 175.

M+M received Quality Control Inspection Reports from Cox through QEDataMax. Id. at ¶ 176. QEDataMax and/or Quality Control Inspection Reports on QEDataMax were not accessible to M+M's Technicians. Id. at ¶ 177. Pursuant to the terms of the FSAs, Cox issued chargebacks to M+M (not its Technicians) for failed quality control inspections. Id. at ¶ 178. Cox was not aware of, nor did Cox have any involvement in, the quality control inspections performed by M+M. Id. at ¶ 179. M+M alone determined whether, and in what amount, it charged back its Technicians based on the quality control inspections performed by Cox and/or M+M. Id. at ¶ 180. M+M's General Manager Dowling logged onto QEDataMax almost every day and pulled up the Quality Control Inspection Reports for the previous day. Id. at ¶ 181. Either Dowling or another M+M Supervisor determined the Technician who performed the job reflected on the Quality Control Inspection Report, of which Cox was not aware. Either Dowling or another M+M Supervisor determined the chargeback amount for any failure on the Quality Control Inspection Reports under the terms of the FSA. Id. at ¶ 182. Dowling and/or another M+M Supervisor then determined whether to issue a chargeback to the Technician who worked the job documented on the Quality Control Inspection Report in the same amount M+M was charged back, in some lesser amount (based on M+M's own mathematical formula), or not at all. Id. at ¶ 183, 184. Cox had no involvement in this process and had no knowledge of if or how M+M issued chargebacks to its Technicians. Id. at ¶ 185. M+M performed quality control inspections of which Cox was not aware, and issued chargebacks to its Technicians in its sole discretion as the result of such inspections. Id. at ¶ 186. M+M did not provide any documentation or information to Cox with respect to whether it issued chargebacks to its Technicians or the amount of any chargebacks it issued to its Technicians. Id. at ¶ 187. M+M could

(and did) decide not to chargeback Technicians in any amount for the chargebacks Cox issued to M+M. Id. at ¶ 188. Cox was not aware of the identity of the Technician who performed the services identified in the Quality Control Inspection Report. Id. at ¶ 189.

## II.    Summary Judgment Standard

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is 'genuine' if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or

problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

Cross-motions for summary judgment "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004) (internal quotation marks and citation omitted). The legal standard for summary judgment is not changed when parties file cross-motions for summary judgment. Adria Int'l Group, Inc. v. Ferre Dev. Inc., 241 F.3d 103, 107 (1st Cir. 2001). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002) (internal quotation marks and citation omitted).

**Analysis**

**A.     Joint Employer Status of Cox under the FLSA**

The relevant provisions of the FLSA apply only to "employers" and their "employees." Under the FLSA, employers must pay their employees a minimum wage. 29 U.S.C. § 206(a). The FLSA's definition of employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Additionally, the FLSA recognizes the concept of "joint employment," or a situation in which employers may share control of an employee based on common or hierarchical control on behalf of the multiple employers. 29 C.F.R. § 791.2. See also Chao v. Hotel Oasis, Inc., 493 F.3d 26, 34 (1st Cir. 2007).

The First Circuit utilizes the "economic reality" test to evaluate whether there is an employer/employee relationship. Baystate Alt. Staffing, Inc. v. Herman, 163 F.3d 668, 677 (1st Cir. 1998); Hamilton v. Partners Healthcare Sys., Inc., 209 F.Supp.3d 379, 390 (D. Mass. 2016). The "economic reality" test is a multi-factor evaluation that considers certain set factors as well as the totality of the circumstances. See Baystate, 163 F.3d at 675 (adopting the economic-realities test). The Court looks to four "regulatory factors" and roughly eight "nonregulatory factors" when determining the economic realities of a purported employment relationship. In considering its application of the economic realities test, the First Circuit focuses on whether an alleged employer (1) has the power to hire and fire the alleged employee; (2) supervised and controlled employee work schedules or conditions of employment; (3) determines the wage rate and method of payment; and (4) maintains employment records. See Chesley v. DirecTV, No. 14-cv-468-PB, 2015 WL 3549129 (D.N.H. June 8, 2015) (citing Baystate, 163 F.3d at 675). In applying the various factors outlined by the First Circuit, "the court has recognized that it is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer." Id. (internal citations omitted). In order for joint employment to exist, however, there must be "an actual employment relationship between the employee and each joint employer." Hamilton, 209 F.Supp.3d at 390.

In its Motion and Reply, Cox points this Court to several other recent cases that have specifically addressed Cox's liability under the FLSA as a joint employer. Cox argues that although these cases arise in other Districts, Cox operates similarly state to state, and the cases provide a framework this Court should follow. Cox also points out that, in addition to the cases involving Cox, there is a body of case law that has considered the joint employer liability of other telecommunications companies and ruled in favor of the telecommunications companies. In short, Cox is arguing that the Court should find that the facts demonstrate that it was not a joint employer of Plaintiffs because it "had no direct control or supervision of any part of the employment of the

technicians with only minimal quality and safety measures such as background checks, customer service surveys, identification badges, labeled vehicles, a contract between the installer and communication company establishing certain requirements for the performance of services, work initially distributed by the communication company but subject to redistribution by the installer without consent of the communication company, and an ability of the communication company to de-authorize a technician for poor quality work." Gremillion v. Cox Commc'ns, No. 16-9849, 2017 WL 1321318 at *4 (E.D. La. April 3, 2017) (citing Thornton v. Charter Commc'ns, LLC, No. 4:12CV479 SNLJ, 2014 WL 4794320, at *16 (E.D. Mo. Sept. 25, 2014); Valdez v. Cox Commc'ns Las Vegas, Inc., No. 2:09-CV-01797-PMP, 2012 WL 1203726, at *6 (D. Nev. Apr. 11, 2012); Zampos v. W&E Commc'ns, Inc., 970 F.Supp.2d 794, 805-806 (N.D. Ill. 2013); Jean-Louis v. Metro. Cable Commc'ns, Inc., 838 F.Supp.2d 111, 137-138 (S.D.N.Y. 2011); and Jacobson v. Comcast Corp., 740 F.Supp.2d 683, 693-694 (D. Md. 2010)).

Plaintiffs argue that these recent cases are not binding precedent and that they are factually dissimilar because M+M had "total economic dependence" on Cox in this case, and that factor sets it apart from the cases Cox urges the Court to follow. Plaintiffs make the argument that the "total economic dependence" of M+M on Cox "colors all the other facts" even though other Courts have found that a similar arrangement was merely "consistent with a legitimate subcontracting relationship." Jacobson, 740 F.Supp.2d at 693. See also Zampos, 970 F.Supp.2d at 805) (stating that the "apparent dependence" of the installation company on the cable company "does not translate into functional control" by cable company over technicians). This Court declines to place paramount significance on the fact that M+M was established to conduct installations for Cox, because the First Circuit has never dictated that this factor takes precedence over the "totality of the circumstances" in the economic realities test and also because it is clear that M+M was never required to work solely

for Cox, but chose to operate in that manner.[2]  (ECF Doc. No. 84 at ¶ 17).   The parties have extensively briefed the issues, and the Court has thoroughly reviewed the facts and arguments set forth.  With the framework of the "economic realities" test and the guidance of Courts that have previously considered this issue, the Court undertakes its consideration of whether Cox is a joint employer of Plaintiffs.

### 1.     Hiring and Firing

It is undisputed that Cox has no authority to hire or fire M+M Technicians. While some of Cox's contractual requirements impact M+M's hiring practices, these specifications do not amount to direct or even indirect power over hiring and firing. For example, Cox requires that M+M maintain qualified and experienced personnel and that Technicians must pass a criminal background check and drug screening before Cox will permit them to enter a Cox customer home. These specifications amount to minimal quality controls and safety measures and do not indicate that Cox controls which applicants are hired or how many.

Moreover, there is no dispute that Plaintiffs submitted their applications to M+M and that Cox did not hire them, M+M did. Under similar circumstances, the District Court for the Eastern District of Louisiana recently found that Cox's lack of involvement in the hiring and firing process weighed against a finding of joint employment.   That Court noted that "[s]imply requiring a background check has not been found sufficient to conclude that a communication company

---

[2]     Plaintiffs contend they have "demonstrated exhaustively the similarities" between the facts presented in the present case and those present in <u>Perez v. Lantern Light Corp.</u>, No. C12-01406 RSM, 2015 WL 3451268 (W.D. Wash. May 29, 2015).  Plaintiffs argue that <u>Perez</u> is most analogous to this case because the installation company in that case lacked a separate economic existence, just as Plaintiffs argue that M+M does in this case.  Contrary to Plaintiffs' argument, however, in <u>Perez,</u> the Installation Company was forbidden from "serving companies offering comparable programming or television services" via "exclusivity language" in the DirectTV contract.  <u>Id.</u> at *6. "Under the exclusivity agreement, Installers who did not get DirecTV work orders could perform no alternate installation work."  <u>Id.</u>  In the present case, the undisputed facts demonstrate that Cox did not dictate who M+M could perform work for, instead M+M made a business decision to work solely for Cox.  Where a company is forbidden from conducting work outside of the parameters of its contract, its economic dependence is unquestionable.  There is no dispute that the facts in this case are different because M+M is not subject to an exclusivity clause. Accordingly, Plaintiffs' argument that this case closely tracks the facts of <u>Perez</u> is unavailing.

possesses authority to hire and fire." <u>Gremillion</u>, 2017 WL 1321318 at *5 (<u>citing</u> <u>Thornton</u>, 2014 WL 4794320 at *2, 14 (finding the communication company was not a joint employer where the Technicians applied and interviewed with the install company, although the communication company pre-approved Technicians and required background checks); <u>Jean-Louis</u>, 838 F.Supp.2d at 123-124 (finding the communication company was not a joint employer where the install company interviewed and hired Technicians, although the communication company required a background check).

Similarly, in other District Court cases, Plaintiff/Technicians have argued that Cox's ability to deauthorize a Technician equated to the ability to effectively fire Technicians. The Courts that have entertained such an argument have roundly rejected it. In <u>Gremillion</u>, for example, the Court noted that "[a] technician de-authorized by Cox could be employed by [M+M] elsewhere or could perform duties that do not require entry into customers' homes." 2017 WL 1321318 at *4. <u>See also</u> <u>Thornton</u>, 2014 WL 4794320, at *14 (finding no joint employer relationship although the communication company could de-authorize a technician); <u>Jean-Louis</u>, 838 F.Supp.2d at 125 (same); <u>but</u> <u>see</u> <u>Perez</u>, 2015 WL 3451268 at *17 (finding a joint employer relationship where the communication company could de-authorize a technician pursuant to an exclusive contract with the install company). As the <u>Thornton</u> court explained, the ability to de-authorize a technician "was to ensure customer safety and quality service" and did "not evidence a joint employer relationship." 2014 WL 4794320, at *14; <u>see</u> <u>Zampos</u>, 970 F.Supp.2d at 803 ("To the extent [the communication company] plays a role in the hiring and firing process, it is only in the context of quality control, safety and security of [its] customers...."). In short, the undisputed facts establish that it was M+M that was responsible for hiring and firing its Technicians and the specifications set forth by Cox amounted to minimal safety and quality measures. Accordingly, this factor weighs against finding a

joint employment relationship.

## 2.    Supervision and Control

It is undisputed that Cox does not supervise or control the work schedules or conditions of employment of M+M Technicians. The method by which Cox's work orders are distributed to Cox changed in 2014, and currently Cox allocates work orders to Technician Numbers via a web-based automatic routing program called ETA.  M+M can then reassign the work orders as it sees fit for efficiency and can do so without discussing with Cox or obtaining Cox's consent.

Cox notes that "numerous" recent Federal Court decisions have noted that auto-routing computer programs that assign work to a technician number do not evidence control over a Plaintiff-installer's work schedule.  See (ECF Doc. No. 96 at p. 20) (citing Valdez, 2012 WL 1203726 at *3-4).  Coupled with the testimony of Plaintiffs in which they admitted that they reported to M+M facilities each morning to receive their work orders from William Dowling and that he could modify work orders, Plaintiff's position that Cox exerted "intensive, specific and micromanaging" control of their work schedules is unsupported.  (See ECF Doc. No. 96 at pp. 21-22) (citing Plaintiffs' deposition testimony).

Plaintiffs also broadly contend that Cox dictated the manner, method and mode by which M+M Technicians were to complete their work including "the color of ground tags, the type of pen used to mark tags, providing product literature, and picking up trash at the work site."  (ECF Doc. No. 88-1 at p. 16.)  In its Reply, Cox argues that all of the examples set forth by Plaintiffs are evidence of "safety and quality control, as opposed to the type of control employers display with employees." (ECF Doc. No. 96 at p. 2).   This Court agrees.

Further, although Cox requires that M+M Technicians wear clothing and drive vehicles identifying them as Cox-approved, Cox argues this safety measure is to ensure that Cox customers

know that the appropriate person is entering their home. Cox's random quality control checks and customer surveys result in feedback to M+M, not directly to the Technicians. The <u>Gremillion</u> Court joined several other courts in noting that "even a high degree of supervision or control may not trigger a joint employer finding where the purpose of the control is to maintain customer safety, whereas this factor might indicate a joint employer relationship where the purpose of the control is day-to-day management." 2017 WL 1321318 at *6. Here, the undisputed facts show that the purpose of identifying Cox on the Technician's badge and vehicle is to ensure customer safety and the purpose of the surveys and quality control checks is to ensure satisfaction of Cox customers. These examples do not amount to day to day supervision or control of an M+M Technician's schedule or working conditions. This factor also weighs against finding a joint employment relationship.

### 3. Payment

There is no dispute that Plaintiffs received paychecks and tax forms from M+M. It is also undisputed that Cox had no involvement in how M+M paid Plaintiffs or the amount, if any, that was deducted from their paychecks. Pursuant to the FSA, Cox paid M+M under a point-based system. Importantly, Cox did not dictate how M+M paid its Technicians. In <u>Zampos</u>, 970 F.Supp.2d at 804, the Court rejected the argument that Comcast controlled the rate and method of payment of technicians' pay by setting terms of pay to technicians' direct employer for services rendered. "An employee's income, received from its direct employer, will always be 'determine[d] and influence[d]' by what a contractor decides to pay the direct employer for services rendered by the employee. To find that this arrangement places Comcast in control of Plaintiffs' wages would dramatically expand the FLSA to subsume traditional independent contractor relationships." <u>Jacobson</u>, 740 F.Supp.2d at 692 (internal citation omitted). The Court is persuaded to follow the

reasoning of these cases and rejects Plaintiffs' assertions that this arrangement constitutes evidence of control over payment of M+M Technicians. (ECF Doc. No. 88-1 at pp. 21-22.)

**4.    Employment Records**

It is uncontested that the only records Cox maintains are related to the Technician Badges which include a Technician's name and identification number as well as any quality-control information. It is also uncontroverted that Plaintiffs submitted their time sheets to M+M and that M+M maintained records of the same. Plaintiffs argue that Cox maintained records of work order data including "including customer satisfaction records," "amount of points earned" and similar data. (ECF Doc. No. 88-1 at p. 24.) Assuming this information to be accurate, it is precisely the type of information needed by Cox to make its payment to M+M, and also to ensure customer safety. Cox argues that the quality control reports, work orders and invoices do not constitute "employment records" in any event. (ECF Doc. No. 96 at p. 34.) Accordingly, this factor weighs against finding a joint employment relationship.

**5.    Conclusion on FLSA Liability**

The undisputed facts establish that Cox is not Plaintiffs' joint employer under the FLSA. As discussed herein, Cox's purported control over Plaintiff's hiring and firing, including the background check requirement, Cox's distribution of work orders through a computer system and its method for retrieving customer feedback reflect no more than a legitimate contractor relationship. I recommend that the District Court find that Cox is not Plaintiffs' joint employer under the FLSA, and that its "involvement in hiring, firing, supervision, scheduling, and payment of technicians is minimal and indirect at best." <u>Gremillion</u>, 2017 WL 1321318 at *7.

**6.    Conclusion on RIMWA Liability**

It is undisputed that, "Rhode Island law governing wages is similar to the FLSA." <u>Harbor</u>

Cruises LLC v. R.I. Dep't of Labor, No. PC-05-5076, 2008 WL 4961656 (R.I. Super. Ct. Nov. 10, 2008). Accordingly, in their pleadings, both parties acknowledge that Plaintiffs' RIMWA claims "should be analyzed under the same standard as the FLSA [claims]." (See ECF Doc. No. 100 at p. 5 n.3). Plaintiffs even point out that there was no need to separately address "joint employment liability in the context of the RIMWA" because the RIMWA mirrors the FLSA. Id. Because I am recommending that the District Court GRANT Cox's Motion for Summary Judgment under the FLSA, I further recommend Cox's Motion be GRANTED as to the RIMWA claim.

## III.    CONCLUSION

For the reasons stated, I recommend that the District Court GRANT Cox's Motion for Summary Judgment (ECF Doc. No. 83) and DENY Plaintiffs' Combined Cross-Motion for Summary Judgment. (ECF Doc. No. 89).

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/  Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
February 7, 2018