## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JUAN SIGUI, JOSE SIGUI, JOSE CIPRIANO, JOSEPH MENDEZ, JOSE L. SANTOS, JEROME JOHNSON, NELKIN RAMIREZ, and` ADALBERTO MOLINA, ) ) ) ) ) ) | |
| Plaintiffs, ) | |
| v. ) | C.A. No. 1:14-CV-00442-MSM-LDA |
| M + M COMMUNICATIONS, INC. alias, M & M CORPORATION LA INC., ) ) ) | |
| Defendants. ) | |

## <u>MEMORANDUM AND ORDER</u>

Mary S. McElroy, United States District Judge.

The plaintiffs, Juan Sigui, Jose Sigui, Jose Cipriano, Joseph Mendez, Jose L. Santos, Jerome Johnson, and Adalberto Molina, each worked as Field Service Technicians for defendants M + M Communications, Inc. and M & M Corporation LA, Inc.[1] (collectively "M + M") between 2011 and 2014 for the purpose of performing installation, maintenance, and construction services on cable television, internet, and telephone lines equipment for Cox Communications ("Cox"). The plaintiffs have brought this action asserting that M + M had at times misclassified them as independent contractors rather than employees, failed to pay them wages for all

---

[1] M & M Corporation LA Inc. is the successor-in-interest to M + M Communications Inc. with respect to debts, obligations, liabilities, claims, rights, and assets.

hours worked, and failed to pay overtime pay for all hours worked in excess of forty hours in any one workweek.

The plaintiffs seek partial summary judgment as to liability on three claims:

1. That M + M has misclassified the plaintiffs as independent contractors for periods of time in violation of R.I.G.L. § 28-14-19.1;

2. That M + M failed to pay the plaintiffs wages for all hours worked in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and/or the Rhode Island Payment of Wages Act ("RIPWA"), R.I.G.L. § 28-12-1 *et seq.* and § 28-14-1 *et seq.*; and

3. That M + M has failed to pay the plaintiffs overtime pay for all hours worked in excess of 40 hours in any one workweek in violation of the FLSA and the RIPWA.

M + M has filed a cross-motion for summary judgment on the same issues.

For the following reasons, the Court GRANTS IN PART and DENIES IN PART the plaintiffs' Motion (ECF No. 132) and DENIES M + M's Cross-Motion (ECF No. 138).

## I.     BACKGROUND

The following facts are undisputed unless otherwise noted.

The plaintiffs were hired and paid by M + M as Field Service Technicians ("Technicians") to perform on-site installation, maintenance, and/or construction work on cable television, internet, and/or telephone lines and equipment for customers of Cox in and around the State of Rhode Island.  Throughout their tenure

with M + M, each plaintiff, except plaintiff Johnson, was paid as an IRS Form W-2 employee for a certain amount of time and as an IRS Form 1099 independent contractor for other periods of time.[2]  (ECF No. 132-2 ¶¶ 91-95, 97-101.)   The work that plaintiffs performed for M + M and the terms and conditions of employment to which they were subject remained the same whether they were paid as W-2 employees or as independent contractors.

## A. Hiring and Training

Each year, M +M signed a Field Service Agreement ("FSA") with Cox that dictated the terms, conditions, and manner in which M + M provided services for Cox. *Id.* ¶¶ 11-13.  Pursuant to those FSAs, Technicians hired by M + M had to complete background checks and were evaluated by M + M's General Manager to determine if they met certain standards that qualified them to work for M + M. *Id.* ¶¶ 7, 85.  Once hired, Technicians were required to, among other things, successfully complete the requirements prescribed in the "Qualified Cox Contractor Requirements Program" to work on Cox customer accounts through M + M. *Id.* ¶¶ 22-24. Technicians were then required to attend weekly mandatory meetings every Thursday morning to receive ongoing training.  *Id.* ¶¶ 30.  The training included reviewing training materials and handouts provided by Cox detailing minimum standards on how Technicians were required to properly perform their work.  *Id.* ¶¶ 26-27, 30-31.

---

[2] Plaintiff Jerome Johnson was classified as an employee during his entire 2013 tenure with M + M.  (ECF No 132-2 ¶ 103.)

## B. Assignment of Work

After a Cox customer requested a service to be performed, Cox would generate a work order that included the precise date and time block that the requested work was scheduled to be performed, the specific Technician identified by technician number who was assigned to perform the work, the name, address and account number of the customer, the precise work location, the particular work to be performed for the customer, the supplies that the Technician needed to bring to complete the work, and the point value assigned for the work that the customer requested. *Id.* ¶ 62. The work order was produced through Cox's proprietary database known as ICOMS and assigned to M + M via ICOMS and into a workforce management system known as ETA. *Id.* ¶¶ 65-66, 68. Cox granted M + M access to ICOMS and ETA and gave M + M a series of technician identification numbers that M + M would assign to each Technician. *Id.* ¶ 67.

The plaintiffs, like all Technicians, were required to use the ETA system to electronically notify M + M and Cox when they commenced work for a customer and when they completed the work and the specific work they performed. *Id.* ¶ 108. At the end of the day, Technicians checked in with M + M to see if there were any additional work orders for that day. *Id.* ¶ 109.

The parties dispute that the Technicians were required to show up to M + M's Warwick facility at 7:30 a.m. Monday through Saturday. (ECF No. 139 ¶ 128.) It also is disputed that the Technicians were required to collect all of their equipment and supplies from M + M's Warwick warehouse. *Id.* ¶ 136.

4

M + M assigned the plaintiffs work on weekdays according to two-hour time blocks beginning at 8:30 a.m. to 10:30 a.m. and ending at or about 5:00 p.m. to 7:00 p.m. (ECF No. 132-2 ¶ 106.) M + M disputes, however, that the plaintiffs were assigned to all blocks each day as well as the plaintiffs' assertion that they often worked twelve-hour days up to six days a week. (ECF No. 139 ¶¶ 129-30.)

## C. Supervision and Control

M + M required the plaintiffs to perform their work according to guidelines and specifications established by Cox. (ECF No. 132-2 ¶ 41.) M + M and Cox monitored the plaintiffs' performance of work through inspections and customer feedback to ensure that it was performed in accordance with those guidelines. *Id.* ¶¶ 46-52. Inspection results and feedback were used to train Technicians at the M + M mandatory weekly meetings at its Warwick facility. *Id.* ¶ 50. Further, M + M used this information to provide a ranking of each Technician's performance level compared to other Technicians. *Id.* ¶ 52.

M + M also had a system of "back charging" in place where M + M could deduct an amount from a technician's paycheck for improper or incomplete work. *Id.* ¶ 60. Though it had the ability to do so, M + M maintains that it never actually back charged any of these plaintiffs. (ECF No. 139 ¶ 153.)

M + M supplied and mandated the type, style, and color of the plaintiffs' uniforms and required the display of M + M and Cox's business names on the plaintiff's uniforms and vehicles. (ECF No. 132-2 ¶¶ 75-77, 79, 81.) M + M also provided the plaintiffs with certain supplies and equipment necessary to perform the

work.  *Id.* ¶¶ 118-19.  The plaintiffs, however, provided their own vehicles, some additional tools, and, during the period they were classified as independent contractors, liability insurance.  *Id.* ¶ 123.

The plaintiffs did not negotiate, bid on, refuse, or select the work assignments issued by M + M.  *Id.* ¶ 114.

### D. Compensation Scheme

The plaintiffs did not negotiate their own rates and pay structure with M + M nor were they able to submit a bid for performance of the work.[3]  *Id.*  Instead, the plaintiffs were each paid fixed, per-task rates for the assigned work completed, based upon a task-based system of compensation.

In 2011, the compensation scheme was based on monetary values assigned to each discrete task assigned to and properly completed by the plaintiffs.  *Id.* ¶ 140. Beginning sometime in 2012, Cox assigned a certain "point" value to each discrete task completed by the plaintiffs, based upon the average amount of time that it was estimated to take a technician to complete a particular job.  *Id.* ¶ 141.  The parties dispute whether a "point" was equal to five minutes of work performed.  (ECF No. 139 ¶ 142.)  Nevertheless, the plaintiffs were paid weekly based on the number of points earned from completing assigned tasks multiplied by the dollar value M + M assigned to a point.  (ECF No. 132-2 ¶ 147.)

---

[3] Though M + M nominally disputes this fact, the record evidence it points to does not support such a denial.  (ECF No. 139-3 at 71.)

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug. Inc.,* 895 F.2d 46, 50 (1st Cir. 1990).  Summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000).

When examining cross-motions for summary judgment the applicable standard does not change, and the Court must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *Green Mountain Realty Corp. v. Leonard,* 750 F.3d 30, 38 (1st Cir. 2014).

## III.   DISCUSSION

### A.  Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*

Whether the plaintiffs are employees under the FLSA is fact-intensive analysis; however, it is ultimately a question of law.  *See McFeeley v. Jackson St. Entm't,* LLC, 825 F.3d 235, 240 (4th Cir. 2016); *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1059 (2d Cir. 1988); *Pizzarelli v. Cadillac Lounge, L.L.C.,* 2018 WL 2971114, at

*2–3 (D.R.I. Apr. 13, 2018)  On cross-motions for summary judgment, the question may appropriately be decided when there is no dispute as to material facts. *Pizzarelli*, 2018 WL 2971114, at *2–3.

An entity is said to "employ" a person under the FLSA if it "suffers or permits" the person to work. 29 U.S.C. § 203(g).  Courts employ the "economic reality" test to determine if a person is an employee, and thereby entitled to FLSA's protections. *See Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998).   In short, the issue is whether the totality of the circumstances demonstrate that the person is "a putative employee economically dependent on their alleged employer." *Id.*; *see also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985) ("The test of employment under the Act is one of 'economic reality.'").  "The touchstone of the 'economic realities' test is whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" *McFeeley*, 825 F.3d at 241 (quoting *Schultz v. Capital Int'l. Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006)).

Courts consider the following factors to determine a plaintiff's dependency:

(i)     the degree of control exercised by the alleged employer;
(ii)    the extent of the relative investments of the worker and alleged employer;
(iii)   the degree to which the worker's opportunity for profit and loss is determined by the alleged employer;
(iv)    the skill and initiative required in performing the job;
(v)     the permanency of the relationship; and
(vi)    the degree to which the alleged employee's tasks are integral to the employer's business.

*See Baystate*, 163 F.3d at 675 n.9.  "These factors are merely aids in determining the

underlying question of dependency, and no single factor is determinative." *Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 327 (5th Cir. 1993).

An employer's designation of workers as employees or independent contractors is "not dispositive, or even controlling." *Benion v. LeCom, Inc.*, 336 F. Supp. 3d 829, 838 (E.D. Mich. 2018). "The reason is simple: The FLSA is designed to defeat rather than implement contractual arrangements." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 808 (6th Cir. 2015). The broad definition of "employee" under the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

## B. Rhode Island Law: The Right-to-Control Test

In addition to the FLSA, the plaintiffs seek relief under Rhode Island Payment of Wages Act. Under Rhode Island law, "the test [as to] whether a person is an independent contractor is based on the employer's right or power to exercise control over the method and means of performing the work and not merely the exercise of actual control." *Cayer v. Cox Rhode Island Telecom, LLC*, 85 A.3d 1140, 1144 (R.I. 2014). "Rhode Island's common law test is much broader than the FLSA control factor because it does not consider whether Defendant actually controlled Plaintiff, only whether Defendant had the right to do so." *Pizzarelli*, 2018 WL 2971114, at *6.

## C. Analysis of the Economic Reality Test Factors

The Court will now consider the several factors relevant to whether the plaintiffs' employment status under the FLSA can be determined as a matter of law.

### 1.  Control

The primary question for this factor is whether the workers were subject to control "such that they did not stand as 'separate economic entities' who were 'in business for themselves.'"  *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1313 (11th Cir. 2013).

M+M does not dispute any key material facts relevant to control.  Instead, it primarily argues that it did not control the plaintiffs because the method and means of performing the work was dictated by Cox guidelines and specifications.  The plaintiffs correctly note that Cox has been dismissed from this case because it did not itself exercise the day-to-day control necessary to be considered the plaintiffs' employer.  (ECF No. 117.)  The Court finds that M + M has in turn directly imposed requirements indicative of employment status upon its workers.

The following aspects of the working relationship satisfy the control factor:

<u>Performance of work</u>:  M + M exercised near complete control over the plaintiffs' performance of their work, from the work orders assigned to each plaintiff, the amount and types of equipment allowed out of the warehouse, the manner that each task was to be performed, to the requirements for interacting with Cox customers.  Any work found not in conformance with Cox and M + M requirements was critiqued in weekly mandatory meetings and each Technician's performance level was compared to each other's and ranked accordingly.  Further, M + M exercised discretion to back-charge Technicians for incomplete or nonconforming work.  These undisputed facts are compelling evidence of an employer/employee relationship.  *See*

*Benion*, 336 F. Supp. 3d at 852; *Thornton v. Mainline Commc'ns, LLC*, 157 F. Supp. 3d 844, 849-50 (E.D. Mo. 2016).

Uniforms:  M + M's requirement that the plaintiffs wear specific uniforms, ID badges, and that they display logos on vehicles is indicative of an employer-employee relationship. *See Benion*, 266 F. Supp. 3d at 852; *Thornton*, 157 F. Supp. 3d at 851; *Hollis v. Dump Cable, Inc.*, 2014 WL 12526724, at *8 (W.D. Tenn. June 23, 2014).

Direct supervisory authority:  M + M had the ability to hire and fire the plaintiffs as well as the authority to monitor their work.  Such supervisory authority is indicative of an employer-employee relationship. *See Scantland*, 721 F.3d at 1314; *Benion*, 336 F. Supp. 3d at 825; *Thornton*, 157 F. Supp. 3d at 850-51.

Economic power:  M + M maintained all of the economic power in the relationship with the plaintiffs, exerted by determining when and whether the plaintiffs would be paid either as employees or as independent contractors, determining the dollar amount paid to the plaintiffs for completed work under the per-point payment scheme, and the ability to back charge for unsatisfactory or incomplete work.  This strongly indicates an employer-employee relationship. *See Parrilla*, 2009 WL 2868432, at *3.

Work schedules:  M + M's control over work schedules and the amount installers were paid, indicates an employer-employee relationship. *See Scantland*, 721 F.3d at 1313-14; *Parrilla*, 2009 WL 2868432, at *3; *Thornton*, 157 F. Supp. 3d at 850.

### 2.  The Worker's Opportunity for Profit or Loss Depending on His Managerial Skill

This factor questions whether workers "had an opportunity for greater profits based on [their] management and technical skills."  *Keller*, 781 F.3d at 812.  "If the individual's 'opportunity for profit or loss appears to depend more upon the managerial skills of [the alleged employer] … than it does upon the [individual's] own judgment and industry,' this factor weighs in favor of employee status."  *Flores v. Velocity Express LLC*, 250 F. Supp. 3d 468, 486 (N.D. Cal. 2017).  "This factor is relevant because experiencing profit or loss based on one's managerial skill is a characteristic of running an independent business."  *Collinge v. IntelliQuick Delivery*, 2015 WL 1299369, at *4 (D. Ariz. Mar. 23, 2015).

This factor does not depend upon whether a worker can work more efficiently, and therefore make more money; rather, it depends on the worker's ability to profit in relation to business decisions such as investment and administration.  *See Sec'y of Labor v. Lauritzen*, 835 F.2d 1529, 1536 (7th Cir. 1987) ("Although the profit opportunity may depend in part on how good a pickle picker is, there is no corresponding possibility for migrant worker loss. … Any reduction in earnings due to a poor pickle crop is a loss of wages, and not of an investment."); *Parrilla*, WL 2868432, *4 ("No matter how quickly or efficiently Plaintiff worked, Defendant's charge-backs, the manner in which it assigned jobs, and the directives it gave to sometimes leave jobs prior to their completion obviated Plaintiff's ability to rely upon his own managerial skill."); *Solis v. Cascom*, 2011 WL 10501391 (S.D. Ohio Sept. 21, 2011) ("There was no opportunity for increased profit or loss depending upon an

12

alleged employee's managerial skill.  While the alleged employees were free to work additional hours to increase their income, they had no decisions to make regarding routes, or acquisition of materials, or any facet normally associated with the operation of an independent business."); *Scantland*, 721 F.3d at 1317 ("An individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business.").

Even if the plaintiffs could work efficiently to finish a job more quickly, as M + M suggests, the plaintiffs had no control over the jobs that they were assigned. Indeed, the plaintiffs could not refuse jobs that would have been unprofitable.[4]  While there may be some side work that the plaintiffs could perform, like hanging televisions for customers, this was minimal and took place outside of the normal hours the plaintiffs were expected to work.  As such, this factor favors a finding of employment status.

### 3. The Worker's Investment in the Business

To determine whether a worker's capital investment shows evidence of economic independence, courts "must compare the worker's investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance." *Keller*, 781 F.3d at 810.  "The investment which must be considered a factor is the amount of large

---

[4] For instance, M + M concedes that plaintiff Joseph Mendez was fired on January 17, 2014, for refusing to drive a route in western Rhode Island.  (ECF No. 140 ¶ 9.)

capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Baker v. Flint Eng'g & Const., Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998). This factor "is interrelated to the profit and loss consideration." *Id.*

The difference between M + M's investment and the plaintiffs' is vast. The plaintiffs did not invest significant monies in equipment or facilities used in performing services for M + M; the only investment made by the plaintiffs was in liability insurance (during the time they were classified as independent contractors), and in tools and vehicles, which could be used for other purposes. M + M, on the other hand, maintained a secure warehouse to house all Cox provided inventory, an office facility, all employee wages (including the owner, general manager, field managers, warehouse manager, dispatch operators, bookkeepers, etc.), accounting services, furniture, computers, software, printers, 25-50 trucks/bucket trucks, meters, etc. (ECF No. 132-2 ¶ 124.)

Worker investments in standard tools and other equipment, including vehicles, that can also be used for personal use are not fatal to a claim of employee status. *See Roeder v. DirecTV, Inc.*, 2017 WL 151401, at *17 (N.D. Iowa Jan. 13 2017) ("Both vehicles had been purchased prior to taking DIRECTV work orders and the record does not establish plaintiffs purchased them solely for the purpose of performing DIRECTV work."); *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) ("Although the driver's investment of a vehicle is no small matter, that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes."); *Parrilla*, 2009 WL 2868432, *4.

14

While M + M cites cases where workers that provide their own tools, vehicles, insurance, and licenses and certifications have been held to be independent contractors, these cases did not weigh the relative investments of the parties. *See Herman v. Mid-Atlantic Installation Services*, 164 F. Supp. 2d at 675; *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 608 (E.D.N.Y. 2012).

The Court finds that a weighing approach is necessary. Often, workers must make some investment in equipment to properly perform a job but to understand the full economic reality, as well as the level of dependence, it must be compared to the investment made by the putative employer. Here, the plaintiffs' contributions were starkly outweighed by M + M's operation. This factor therefore is indicative of employment status.

### 4. The Degree of Skill and Independent Initiative Required to Perform the Work

This inquiry is focused on whether an individual's profits increased because of the "'initiative, judgment[,] or foresight of the typical independent contractor,' or whether his work 'was more like piecework.'" *Keller*, 781 F.3d at 809. The manner in which the skill is gained is crucial: an independent contractor is more likely to have gained the relevant skill through "formal education, an apprenticeship, or years of experience," but "if the worker's training period is short, or the company provides all workers with the skills necessary to perform the job," the worker is more likely an employee. *Id.*

The plaintiffs argue that, while some Technicians had experience with cable installation prior to working for M + M, once hired, all Technicians received specific

training.  This included a successful completion of the requirements prescribed in the "Qualified Cox Contractor Requirements Program," evaluation by M + M to ensure they were technically proficient, and the requirement to attend weekly meetings to receive ongoing training, including reviewing training materials and handouts provided by Cox.

M + M argues that the plaintiffs were skilled workers and were fully trained when it hired them.  Indeed, M + M cites to the deposition testimony of its owner, Michael Jackman, who testified that the plaintiffs were "fully trained" when they were hired.

Although the weight of the evidence suggests that the plaintiffs received specific training at M + M, the Court cannot weigh evidence on a motion for summary judgment.  *See Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014) (holding that on a motion for summary judgment, a court "may neither evaluate the credibility of witnesses nor weigh the evidence").

Thus, there is a question of fact on this factor.  However, the absence of a single factor may not preclude summary judgment when it is outweighed by the totality of the other factors that appropriately should be decided as a matter of law.  The "economic reality" test after all is an aid and "no single factor is determinative." *Reich*, 998 F.2d at 327.  *See also Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) ("[T]he determination of the [employer-employee] relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity.").

### 5.  The Permanence or Duration of the Working Relationship

"Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015).

Each of the plaintiffs was hired for an indefinite period of time and worked until they were fired or quit.  The plaintiffs also worked exclusively for M + M during their employment and did not offer their services to other cable companies or the public.  Additionally, the plaintiffs were frequently assigned work orders from 8:30 a.m. through the last schedule block, ending at 7 p.m.  This schedule made it effectively impossible for the plaintiffs to perform work for any other employers.

Similar facts have been held to be indicative of employment status. *See Parilla*, 2009 WL 2868432, at *5 ("Plaintiff was expected to show up at Defendant's office each morning, six days a week, and was given work orders that typically amounted to a full day's worth of work.  This relationship continued for nearly one and a half years."); *Solis*, 2011 WL 10501391, at *6 ("Installers were hired for an indefinite period.  While some installers were only at Cascom a few weeks, most of the installers were employed by Cascom for the entire period of his 1.5 year investigation.  Each worked until they quit or were terminated by Cascom, similar to an at-will employment arrangement."); *Benion*, 336 F. Supp. 3d at 848-49 ("Although

17

[defendant] testified that the plaintiffs could work for other companies if they chose, the plaintiffs were expected to work full days….").

While the defendant argues that the employment duration here was generally less than five years, durations of much shorter time periods have been considered permanent. *See Thornton*, 157 F. Supp. 3d at 851 (plaintiffs worked at defendant for over two years); *Solis v. Cascom*, 2011 WL 10501391, at *6 (S.D. Ohio Sept. 21, 2011) (finding factor weighed in favor of employee status when "most of the installers were employed by Cascom for the entire period of his 1.5 year investigation."); *Parilla*, 2009 WL 2886432, at *5 (finding nearly one and a half years relationship met permanency requirement for employee status).

Furthermore, although the defendant maintains that the plaintiffs were not precluded from working for others, the nature of scheduling and other control facts (described above) indicate that this was not a realistic possibility. This factor therefore indicates employment status.

### 6. The Extent to Which the Work is an Integral Part of the Employer's Business

"The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 815 (6th Cir. 2015). Here it is clear that M + M exists solely for the purpose of contracting directly with Cox and hiring Technicians such as the plaintiffs to perform work pursuant to Field Service Agreements. As such, the plaintiffs are integral to M +M. *See Benion*, 336 F. Supp. 3d at 854; *Thornton*, 157 F. Supp. 3d at 851; *Scantland*, 721 F.3d at 1318.

M + M does not contest this factor; rather, it argues that this factor is not particularly important in the analysis.  While it is true that not all courts consider this factor, the Court here does so "because it gives a complete picture of the business relationship between the parties." *Pizzarelli*, 2018 WL 2971114 at *6.

### 7.  Additional Factors and the Totality of the Circumstances

Courts also look to whether "the business had 'authority to hire or fire the plaintiff,'" *Keller*, 781 F.3d at 807, "whether the defendant maintains the plaintiff's employment records and establishes the rate and method of payment," *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012), and whether the defendant ever classified the workers as employees, *Superior Care*, 840 F.2d at 1059.  All of the above facts exist in this case.  Having considered the undisputed facts in light of the factors of the economic reality test, the Court finds as a matter of law that the plaintiffs were employees of M + M.

### D.  Misclassification of the Plaintiffs in Violation of R.I.G.L. § 28-14-19.1

Finding that, under the economic reality test, M + M and the plaintiffs were in an employer-employee relationship, it follows that M + M is liable under R.I.G.L. § 28-14-19.1(a), which provides that it is a violation to misclassify "a worker … as an independent contractor when the worker should be considered and paid as an employee[.]"

The parties dispute whether this determination of liability entitles the plaintiffs to treble damages.  Because the issue before the Court is solely the question of liability, any determination of the extent of the plaintiffs' award will be reserved

for proceedings on damages.

### E. Unpaid Wages and Overtime

Appropriately being classified as employees, the plaintiffs next assert that they were not paid for a substantial amount of time performing certain work required by M + M.  This failure to pay for all time expended performing work, including unproductive time, they argue, violated both the FLSA and RIWPA, both of which require a minimum wage be paid and overtime paid for hours worked in excess forty per week.  *See* 29 U.S.C. §§ 206, 207(a)(1); R.I.G.L. § 28-12-1 *et seq.*

The uncompensated time that the plaintiffs point to, largely through their own affidavits, included mandatory weekly training meetings, time each day reporting to M + M's office, waiting for M + M to assign work orders to each plaintiff, obtaining necessary equipment from M + M's warehouse, and driving to each customer's location to complete the work order, and the fact that they only were paid only for completed work orders.

But M + M asserts by way of the deposition testimony of its principals that the plaintiffs were not required to and did not come to the warehouse each day (e.g., if they already had their equipment with them); that the plaintiffs were not assigned work during every time block, that they were not required to report to M + M's facility each day at 7:30 a.m.; and that no evidence demonstrates that a "typical" workday was twelve hours or that the plaintiffs sometimes worked 70 hours in a week.

Secondly, the plaintiffs assert that M + M failed to maintain accurate records and therefore the Court must infer that the records would have included wage and

hour violations.  *See, e.g.*, *Andrews v. Weatherproofing Tech., Inc.*, 277 F. Supp. 3d 141, 151 (D. Mass. 2017) ("An employee who proves that the relevant records kept by the employer are unreliable is held to a less stringent standard of proof in establishing damages for unpaid overtime compensation under the FLSA."); *Boyke v. Superior Credit Corp.*, 2006 WL 3833544, at *5 (N.D.N.Y. Dec. 28, 2006) ("It has been repeatedly held that, unless the employer can provide accurate estimates of hours worked, it is the duty of the trier of fact to draw whatever reasonable inferences can be drawn from the employee's evidence.").  It is the plaintiffs' assertion that their time sheets are inaccurate because they were instructed by M + M not to record over 40 hours per week and that the records provided are incomplete.

M + M's principals, however, denied in deposition testimony that they ever instructed the plaintiffs to not record more than 40 hours of time worked in any one workweek.  Further, they stated that the records provided were accurate and complete to all relevant times.

The plaintiffs counter, however, that the available timesheets, despite their contention that these were falsified, still add up to over 40 hours per week worked by the various plaintiffs.  The problem here is that these totals are premised on the assumption that each "point" awarded to the plaintiffs equates a five-minute time period.  The defendants, however, have testified that they do not consider each point to be worth five minutes.

Assessment of witness credibility is necessary to answer these questions—something this Court cannot do on a motion for summary judgment. *See Dominguez-*

*Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000) (holding that a court "should not engage in credibility assessments" at the summary judgment stage). While the plaintiffs may be entitled to a "less stringent standard of proof" if it is determined that M + M's records are incomplete or unreliable, it remains that there are foundational questions of material fact on the issues of uncompensated time and overtime that cannot be resolved on a motion for summary judgment.[5]

## IV.   CONCLUSION

The Court finds that the economic reality of the relationship between the plaintiffs and M + M demonstrates as a matter of law that the plaintiffs were employees, as opposed to independent contractors.  As such, the plaintiffs are afforded the protections of the FLSA and RIWPA.  The Court therefore GRANTS the plaintiffs' Motion for Summary Judgment (ECF No. 132) on the issue of employment versus independent contractor status and that the plaintiffs were misclassified in contravention of R.I.G.L. § 28-14-19.1.  Because there are questions of material fact concerning uncompensated time and failure to pay overtime, the Court DENIES the plaintiffs' Motion on those issues.  Finally, the Court DENIES M + M's Cross-Motion (ECF No. 138) in its entirety.

---

[5] The parties also dispute whether FLSA requires that the plaintiffs be compensated by the hour or whether M + M's per-job compensation scheme is lawful.  But because there are foundational facts that are in dispute as to whether the plaintiffs actually worked over 40 hours per week on any given week (even including uncompensated time), the Court will not opine on the statutory framework until such time as the facts are established.

IT IS SO ORDERED.

Mary S. McElroy
United States District Judge
September 3, 2020